THE STATE OF OHIO, APPELLEE, *v.* RAHMAN, A.K.A. SMILEY, APPELLANT.

[Cite as State *v.* Rahman (1986), 23 Ohio St. 3d 146.]

(No. 84-1961—Decided April 30, 1986.)

*John W. Allen,* prosecuting attorney, and *Jerry E. Ault,* for appellee.
*Randall M. Dana,* public defender, and *S. Adele Shank,* for appellant.

I

CELEBREZZE, C.J.

Appellant first contends that, pursuant to R.C. 2945.42,[1] his wife was not competent to testify against him at trial. Appellant further argues that allowing his wife to testify concerning privileged marital communications was substantial, prejudicial error in contravention of R.C. 2945.42. Although we reject the first of these contentions, we find merit in the second.

The Rules of Evidence which now govern court proceedings have

---

[1] R.C. 2945.42 provides:

"No person is disqualified as a witness in a criminal prosecution by reason of his interest in the prosecution as a party or otherwise, or by reason of his conviction of crime. Husband and wife are competent witnesses to testify in behalf of each other in all criminal prosecutions, and to testify against each other in all actions, prosecutions, and proceedings for personal injury of either by the other, bigamy, or failure to provide for, neglect of, or cruelty to their children under eighteen years of age or their physically or mentally handicapped child under twenty-one years of age. A spouse may testify against his spouse in a prosecution under sections 2903.11 to 2903.13, 2919.21, 2919.22, or 2919.25 of the Revised Code for cruelty to, neglect of, or abandonment of such spouse. Such interest, conviction, or relationship may be shown for the purpose of affecting the credibility of such witness. Husband or wife shall not testify concerning a communication made by one to the other or act done by either in the presence of the other, during coverture, unless the communication was made or act done in the known presence or hearing of a third person competent to be a witness, or in case of personal injury by either the husband or wife to the other, or bigamy, or failure to provide for, or neglect or cruelty of either to their children under eighteen years of age or their physically or mentally handicapped child under twenty-one years of age, or neglect or abandonment of such spouse under such sections. The presence or whereabouts of the husband or wife is not an act under this section. The rule is the same if the marital relation has ceased to exist."

superseded many of the prior statutes which were procedural in nature. Spousal competency is distinguished from spousal privilege, and each issue is now treated in a separate rule.

Evid. R. 601(B)[2] is a rule of procedure which, as the Staff Note states, is intended to supersede R.C. 2945.42 as to spousal competency. Rule 601(B) provides that one spouse is not competent to testify against the other spouse unless the crime was committed against the testifying spouse or the child of either. In the case *sub judice,* the victim of this crime was the twenty-year-old child of appellant's wife. As the Staff Note also indicates, this rule was drafted broadly enough to encompass both minor and adult children. Therefore, it is clear that appellant's wife was at least competent to testify against him pursuant to Evid. R. 601(B). Appellant's first contention is thus without merit.

However, the Rules of Evidence in Ohio are limited by Section 5(B), Article IV of the Ohio Constitution to procedural effect only. Evid. R. 601 is inapplicable to the substantive spousal privilege, as the Staff Note emphasizes:

"Rule 601 is directed to competency. Rule 501 is directed to privilege and is a general rule serving to maintain R.C. 2945.42 as to privilege.
"* * *

"Rule 601(B) supersedes R.C. 2945.42 as to spousal competency, but not as to spousal privilege."

The spousal privilege contained in this statute is preserved by Evid. R. 501, which states:

"The privilege of a witness, person, state or political subdivision thereof shall be governed by statute enacted by the General Assembly or by principles of common law as interpreted by the courts of this state in the light of reason and experience."

Here, again, the Staff Note to the rule reaffirms the continuing precedence of the spousal privilege contained in R.C. 2945.42:

"Rule 501 * * * leaves the matter of privileges essentially undisturbed. Statutory and case law pronouncements respecting privileges continue in force by operation of the rule."

R.C. 2945.42, which codifies the spousal privilege in a criminal trial, thus creates a substantive right which cannot be abridged by this court or any other. The pertinent portion of this statute reads as follows:

"* * * Husband or wife shall not testify concerning a communication made by one to the other, or act done by either in the presence of the other, during coverture, unless the communication was made or act done ·

---

[2] Evid. R. 601 states:
"Every person is competent to be a witness except:
"* * *

"(B) A spouse testifying against the other spouse charged with crimes except crimes against the testifying spouse or the children of either * * *."

in the known presence or hearing of a third person competent to be a witness, or in case of personal injury by either the husband or wife to the other, * * * or neglect or cruelty of either to their children under eighteen years of age or their physically or mentally handicapped child under twenty-one years of age * * *."

Thus, although a spouse may be competent to testify in a criminal trial, R.C. 2945.42 confers a substantive right upon the accused to exclude privileged spousal testimony concerning a confidential communication made or act done during coverture unless a third person was present or one of the other specifically enumerated exceptions contained in the statute is applicable.

Although appellee admits that testimony forbidden by R.C. 2945.42 was allowed at trial, the state asserts that appellant's right to exclude privileged testimony was abrogated by this court in *State* v. *Mowery* (1982), 1 Ohio St. 3d 192. This assertion is not correct.

The *Mowery* majority, in *dictum,* discussed the rule concerning the privilege to exclude adverse spousal testimony as set forth by the United States Supreme Court in *Trammel* v. *United States* (1980), 445 U.S. 40. In *Trammel,* applying federal common-law principles, the United States Supreme Court held that in federal criminal trials, the witness-spouse was vested with this testimonial privilege and could decide whether to testify adversely to the defendant-spouse. *Trammel* is inapposite to the case *sub judice.* In *Trammel* there was no federal statute explicitly excluding testimony as to confidential marital communications or acts such as R.C. 2945.42. Secondly, the *Trammel* decision was not even necessary to our conclusion in *Mowery.* No privilege was found in *Mowery* because of the presence of a third party during the commission of the crime by the defendant-spouse. As *Mowery* holds in paragraph two of the syllabus:

"An accused may not assert a privilege under R.C. 2945.42 to preclude a spouse from testifying with respect to a crime committed against a third person, where the crime is committed in the known *presence of such third person,* as well as in the presence of the testifying spouse." (Emphasis added.)

Thus, the *Mowery* court began and ended its application of the spousal privilege by looking to the controlling statute, R.C. 2945.42, as we must also do in the case *sub judice.*

Turning to this statute, we can find no exception permitting the testimony of appellant's wife. There was no third person present or within hearing during this conversation as there was in *Mowery.* The spouse was not the victim of this crime and was not present during its commission. The victim of this crime was not a child of the spouse under the age of eighteen, nor was the victim a physically or mentally handicapped child under the age of twenty-one at the time of this killing. Thus, the trial court erred in allowing appellant's wife to testify concerning privileged marital communications.

We must now determine whether that error was harmless, *i.e.*, error which did not affect a substantial right of the accused. Crim. R. 52(A).[3] We conclude that the admission of this testimony undermined appellant's constitutional right to a fair trial, thus bringing the case *sub judice* outside the harmless error doctrine.

It is difficult to minimize the prejudicial impact of the testimony of appellant's wife. The fact is that this spouse was erroneously permitted to tell the jury about confidential marital communications between herself and appellant on the very morning the state alleges this murder took place. Appellant's wife stated that appellant was enraged and accused the victim of stealing family food stamps. Appellant's wife also testified that appellant acted like a crazy man, was so angry at the victim that he drove their car erratically, and used vile language when referring to the victim. This testimony from the accused's own wife surely had an influence on the jury.

Further, this testimony supplied the state's most compelling evidence of motive in a case which otherwise rested on circumstantial evidence against appellant. The state produced no evidence directly linking appellant to this killing. The blood found in the victim's bedroom could not be identified as his. No evidence was presented linking the hammer to the crime. Blood on the knife could not even be identified as human blood. The coroner could not state that the knife found in appellant's bedroom was the murder weapon and testified only that the victim's wounds were not inconsistent with the type of wounds that could have been made by that knife. There was no proof that the blood found on appellant's discarded clothes was that of the victim. Experts could not state with certainty that carpet fibers from those clothes matched the carpet in the victim's bedroom. Thus, although motive is not essential to a conviction, this court has recognized that "[w]here, in a murder case, the evidence is purely circumstantial, the identification of the killer is not shown by direct evidence, and, therefore, his identity must be proved, motive or lack thereof becomes an important question * * *." *State* v. *Lancaster* (1958), 167 Ohio St. 391 [5 O.O.2d 28], paragraph three of the syllabus.

It is evident from the foregoing that the testimony of appellant's wife played a prominent role in his conviction. The United States Supreme Court, in *Chapman* v. *California* (1967), 386 U.S. 18, 23-24, stated that "[a]n error in admitting plainly relevant evidence which possibly influenced the jury * * * cannot * * * be conceived of as harmless." Under the court's test in *Chapman,* in order to sustain a conviction the reviewing court must be able to declare a belief that the error was harmless beyond a reasonable doubt. There must be other overwhelming evidence of guilt.

---

[3] Crim. R. 52(A) defines "harmless error" and reads as follows: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."

*Harrington* v. *California* (1969), 395 U.S. 250, 254; *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, 264.

This court has consistently followed *Chapman.* In *State* v. *Bayless* (1976), 48 Ohio St. 2d 73, 106 [2 O.O.3d 249], vacated in part on other grounds (1978), 438 U.S. 911, we held that "[e]rror in the admission of evidence is harmless if there is no reasonable possibility that the evidence may have contributed to the accused's conviction." In *State* v. *Ferguson* (1983), 5 Ohio St. 3d 160, 166, fn. 5, cited with approval in *State* v. *Maurer supra,* at 264, we stated that "the cases where imposition of harmless error is appropriate must involve either overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction."

Upon a thorough review of the record, we simply cannot state in good conscience that the error in the admission of this privileged testimony was either harmless beyond a reasonable doubt, did not have an impact on the jury, or did not contribute to appellant's conviction in any meaningful degree.[4] We must, therefore, reverse appellant's conviction.

## II

Although we have concluded that the error in admitting privileged spousal testimony alone warrants reversal, appellant also raises several additional propositions of law which we will now address.

Appellant first claims that his wife was incompetent to identify, from the witness stand, a bloodstained shirt and pair of pants as his. Appellant also asserts that this identification was based on his wife's testimony that, during their marriage, she had given the shirt to appellant and had seen him repair the zipper on the pants, thus bringing this testimony within the marital privilege.

These contentions are without merit. We have previously stated in this opinion that appellant's wife was competent to testify. We also do not think that the identification of a shirt and pants which appellant presumably wore on numerous occasions in the presence of his family and other third parties concerned a communication or act excluded by the marital privilege. Appellant's wife's testimony in this regard was thus properly admitted.

---

[4] We are also mindful that our role upon review of this case is not to sit as the supreme trier of fact, but rather to assess the impact of this erroneously admitted testimony on the jury. In writing about the court's function on federal appellate review, Justice John Paul Stevens' observation is particulary appropriate:

" '[I]t is not the appellate court's function to determine guilt or innocence * * *. Nor is it to speculate upon probable reconviction and decide according to how the speculation comes out * * *. [T]he question is, not were [the jury] right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting.' " *United States* v. *Hasting* (1983), 461 U.S. 499, 516, Stevens, J., concurring (quoting *Kotteakos* v. *United States* [1946], 328 U.S. 750, 763-764).

Appellant next contends that the trial court abused its discretion by admitting into evidence several color photographs of the victim's body and a color photograph of an x-ray of the victim's skull. Appellant contends the prejudice caused by admission of these "gruesome" photographs outweighed their probative value and thus should not have been admitted pursuant to Evid. R. 403.[5]

Under Evid. R. 403 the admission or exclusion of such photographic evidence is left to the court's discretion in balancing the probative value against the danger of unfair prejudice. We stated in *State* v. *Maurer, supra,* at 265 that "the mere fact that a photograph is gruesome or horrendous is not sufficient to render it *per se* inadmissible." The photographs in the case *sub judice* depicted the scene in the basement where the victim's body was found and included a photograph of the victim's body taken during the coroner's examination. The photograph of the x-ray depicted the damage to the victim's skull. Each of these photographs illustrated testimony by both lay and expert witnesses. As we observed in *Maurer, supra,* at 265, "[s]uch illustrative photographs are generally admissible." We cannot say that the trial judge abused his discretion in finding that these photographs were admissible because their probative value outweighed any prejudice to appellant. This proposition of law is not well-taken.

Appellant next urges as error the prosecutor's comment, in closing argument, on appellant's post-arrest silence prior to trial. In essence, the prosecutor pointed out to the jury that appellant had not given his version of what happened until he testified at trial. The prosecutor used this post-arrest silence to attack appellant's credibility.

Such a comment is clearly improper under *Doyle* v. *Ohio* (1976), 426 U.S. 610, in which the United States Supreme Court held that the use for impeachment of appellant's post-arrest silence after receiving *Miranda* warnings was violative of the Due Process Clause of the Fourteenth Amendment. In *Doyle,* the prosecutor made numerous references during cross-examination and closing argument to the defendant's failure to explain his actions prior to his testimony at trial. The court held in *Doyle, supra,* at 617-618:

"Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. * * * Moreover, while it is true that the *Miranda*

---

[5] Evid. R. 403 reads as follows:

"(A) Exclusion mandatory. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

"(B) Exclusion discretionary. Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence."

warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial."

We also note, however, that appellant did not object at the time the prosecutor's comment was made. Thus, in the absence of plain error affecting substantial rights, Crim. R. 52(B),[6] this court need not consider this proposition of law.

In *State* v. *Long* (1978), 53 Ohio St. 2d 91 [7 O.O.3d 238], paragraph three of the syllabus, we held that "[n]otice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." With this admonition in mind, we find that the single comment on appellant's post-arrest silence does not reach the serious constitutional impairment of the repeated references to such silence as were made by the prosecutor in *Doyle, supra.*

While we cannot condone even an isolated reference to a defendant's post-arrest silence, we do not find plain error in the prosecutor's remark in the case *sub judice.* Thus, appellant's proposition of law is not well-taken.

Appellant also contends that the prosecutor made repeated comments, designed to appeal to the jury's racial or religious prejudices, which denied him a fair trial. We first observe that the comments which appellant now claims are error also were not objected to at trial. Thus, again, in the absence of plain error, this court need not address this issue.

Certainly, appeals to racial or religious prejudices are improper conduct on the part of a prosecutor and may exert such a substantial influence on the result at trial that reversal is required. *United States* v. *Grey* (C.A.6, 1970), 422 F.2d 1043, 1046. In the cause *sub judice,* however, the prosecutor's cross-examination of appellant properly sought to impeach appellant's credibility.

Appellant had, on direct examination, portrayed himself as a devout Moslem and emphasized his concern for the spiritual and physical well-being of his wife and her children. The prosecutor then fairly sought to point out the contradictions between appellant's testimony and his admitted gambling activities and visits to after-hours establishments for that purpose. If appellant put his religious character in issue, then, pursuant to Evid. R. 404(A)(1),[7] the prosecutor could rebut such evidence. We do not

---

[6] Crim. R. 52(B) defines plain error and reads as follows:

"Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

[7] Evid. R. 404(A)(1) states in part:

"(A) Character evidence generally. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, subject to the following exceptions:

find reversible plain error in the prosecutor's conduct on cross-examination of appellant.

Finally, with regard to appellant's claims regarding prosecutorial misconduct, appellant asserts prejudicial error in the prosecutor's characterization of appellant in closing argument as a "hypocrite" and "the biggest liar that's taken the stand in a long time." Again, the record reflects that no objections were taken at the time these remarks were made.

We first observe that the Code of Professional Responsibility as well as the American Bar Association's Standing Committee on Association Standards for Criminal Justice directly forbid comments by an attorney or prosecutor which express his personal opinion as to the credibility of a witness.[8] In the leading case of *Berger* v. *United States* (1935), 295 U.S. 78, 88, the high court recognized that a prosecutor plays a special role as "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."

This court has, however, also granted prosecutors wide latitude in closing argument. *State* v. *Maurer, supra,* at 269. The effect of any prosecutorial misconduct " 'must be considered in the light of the whole case.' " *Id.* at 266. We must also remember that " [i]f every remark made by counsel outside of the testimony were grounds for a reversal, comparatively few verdicts would stand, since in the ardor of advocacy, and in the excitement of trial, even the most experienced of counsel are occasionally carried away by this temptation.' " *Id.* at 267, quoting *Dunlop* v. *United States* (1897), 165 U.S. 486, 498. Thus, while the prosecutor's remarks in the case *sub judice* were improper, we do not consider these

---

"(1) *Character of accused.* Evidence of a pertinent trait of his character offered by an accused, *or by the prosecution to rebut the same* is admissible; however, in prosecutions for rape, gross sexual imposition, and prostitution, the exceptions provided by statute enacted by the General Assembly are applicable." (Emphasis added in part.)

[8] DR 7-106 of Ohio's Code of Professional Responsibility provides in relevant part:
"(C) In appearing in his professional capacity before a tribunal, a lawyer shall not:
"* * *
"(4) Assert his personal opinion as to the justness of a cause, as to the credibility of a witness, * * * or as to the guilt or innocence of an accused * * *."
The American Bar Association's Standing Committee on Association Standards for Criminal Justice has developed guidelines, one of which states that "[i]t is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant." Standard 3-5.8(b), 1 ABA Standards for Criminal Justice (2 Ed. 1980) 3-87. The accompanying commentary explains:
"Expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment that should separate a lawyer from the cause being argued." *Id.* at 3.89.

remarks standing alone to have risen to the level of plain error requiring reversal.

Appellant next alleges as error the trial court's failure to hold a hearing on his timely challenge to the array of jurors pursuant to Crim. R. 24(E).[9] Appellant's motion to dismiss the array was made orally, and prior to the *voir dire* of prospective jurors in his trial. The motion, however, was based on the mere bald assertion by appellant's attorney that the county commissioners had excluded minorities from the panel. No evidence whatsoever in support of this contention was produced for the trial court or for the record.

Two courts have faced similar challenges to an array by a criminal defendant. In *Frazier* v. *United States* (1948), 335 U.S. 497, the defendant was charged with a violation of a federal narcotics Act and faced a jury composed entirely of federal employees. Petitioner moved that the panel be stricken on grounds his Sixth Amendment right to a trial by an impartial jury was violated. This oral motion was based on the assertion of petitioner's counsel that the procedure used in selecting prospective jurors was "irregular." The Supreme Court held that this motion, supported solely by counsel's unsworn statement and without any proof or offer of proof, was without merit. *Id.* at 503-504.

In *State* v. *Wright* (1976), 290 N.C. 45, 224 S.E. 2d 624, the defendant, who was black, faced an all-white panel of prospective jurors. Defense counsel moved to dismiss the panel "for the reason that there are no blacks." The trial court summarily denied the motion. On appeal, defendant contended that he should have been given the opportunity to show that blacks had been systematically excluded from the panel. The North Carolina Supreme Court rejected this contention. The court noted that defense counsel had been appointed some thirteen months prior to trial and had ample time and opportunity to investigate the exclusion of blacks from juries in that county. Yet, counsel had offered no evidence in support of his motion and had not requested additional time in which to procure evidence. Absent any more than the unsworn allegation made in defendant's motion, the court found no error in the trial court's refusal to hold a hearing. *Id.* at 49, 224 S.E. 2d at 627.

The case *sub judice* presents a situation much like that found in *Frazier* and *Wright, supra.* Appellant's counsel made an unsworn allegation, unsupported by any evidence, that minority persons had been excluded from the jury panel. Absent any evidence or even a proffer for the record in support of this motion, we find no error in the trial court's failure to hold a hearing on appellant's challenge to the array.

---

[9] Crim. R. 24 states in pertinent part: "(E) Challenge to array. The prosecuting attorney or the attorney for the defendant may challenge the array of petit jurors on the ground that it was not selected, drawn or summoned in accordance with law. A challenge to the array shall be made before the examination of the jurors pursuant to subdivision (A) and shall be tried by the court."

Appellant next asserts as error the trial court's failure to hold a hearing on his competency to stand trial after appellant announced he would not continue his testimony. Although appellant did not raise the issue of his competency at this time, he claims that the court, *sua sponte,* should have held a hearing due to the sudden change in his attitude.

R.C. 2945.37(A)[10] states that either the prosecutor, defense or the court *may* raise the issue of a defendant's competency to stand trial. If this issue is raised after trial has begun, the court shall hold a competency hearing *only for good cause shown.* Thus, the decision as to whether to hold a competency hearing once trial has commenced is in the court's discretion.

The test to determine whether a defendant is competent to stand trial was set forth in *Dusky* v. *United States* (1960), 362 U.S. 402, where the high court stated "the 'test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as a factual understanding of the proceedings against him.' "

In *State* v. *Chapin* (1981), 67 Ohio St. 2d 437, 441-442 [21 O.O.3d 273], this court recognized that objective indications such as medical reports, specific references by defense counsel to irrational behavior, or the defendant's own conduct during the trial would indicate "good cause shown" for the allowance of a competency hearing after trial had begun. In holding that good cause had not been shown, the court noted, at 441, fn. 1, "[t]he record is devoid of any other subtle nuances or questionable actions by the appellee throughout this long trial, which is supportive of appellant's argument that an additional hearing is unnecessary."

In the case *sub judice,* the record is also barren of any questionable actions by appellant prior to his refusal to continue his cross-examination. Appellant had testified at length, and articulately, on direct examination and had exhibited no strange behavior either prior to or during his cross-examination.

When appellant refused to continue his testimony, the court immediately dismissed the jury and asked defense counsel if he wished to confer with his client. Defense counsel informed the court that he had conferred with appellant at length the evening before and had no inkling of a problem. There was no suggestion by defense counsel that appellant had suddenly become incompetent to stand trial. The trial court conferred with appellant at length in order to determine the reasons for his refusal to testify. The court also carefully informed appellant of the consequences of his failure to continue testifying. Appellant indicated that he fully

---

[10] R.C. 2945.37(A) states in pertinent part: "In a criminal action in a court of common pleas or municipal court, the court, prosecutor, or defense may raise the issue of the defendant's competence to stand trial. If the issue is raised before trial, the court shall hold a hearing on the issue as provided in this section. If the issue is raised after trial has begun, the court shall hold a hearing on the issue only for good cause shown."

understood those consequences. The court had observed appellant's conduct throughout this trial and, as previously stated, the record does not contain the slightest suggestion that appellant behaved in a manner which would have called any lack of competency to the attention of the court.

Appellant's sudden change of mind was unfortunate, but there is no evidence in the record to convince us that he did not have a reasonable degree of rational understanding of the nature and consequences of his refusal to testify further. Absent any objective indications of "good cause shown," the trial court did not err in failing to hold a hearing into appellant's competency after this trial had begun.

Lastly, appellant contends that the trial court erred in denying his motion for acquittal because the state's case did not preclude all reasonable theories of innocence. Because we are reversing appellant's conviction, we need not now address this proposition of law.

Accordingly, we reverse the judgment of the court of appeals by reason of the erroneous admission of the privileged testimony of appellant's wife and remand this cause for a new trial in accordance with this opinion.

*Judgment reversed*
*and cause remanded.*

SWEENEY, LOCHER, C. BROWN and WRIGHT, JJ., concur.

HOLMES and DOUGLAS, JJ., concur in part and dissent in part.

HOLMES, J., concurring in part and dissenting in part.   I am in accord with the discussion of the majority concerning the privilege that should have been afforded the husband relative to certain testimony of the wife, and agree that the admission of such testimony constituted error. However, I strongly disagree with its harmless error analysis. The unduly narrow views expressed by the majority are neither the standard used by this court nor that adopted by the United States Supreme Court. Furthermore, the majority, in my view, entirely misread the record in the application of its harmless error doctrine. I must, therefore, dissent.

The majority sets forth what it conceives to be the standard for review of errors alleged to be harmless. *Chapman* v. *California* (1967), 386 U.S. 18, 23-24, is quoted for the proposition that: "An error in admitting plainly relevant evidence which possibly influenced the jury * * * cannot * * * be conceived of as harmless." Other parts of *Chapman* are quoted indirectly through other state cases to show that erroneously admitted evidence cannot be harmless if "[it] may have contributed to the accused's conviction." See *State* v. *Ferguson* (1983), 5 Ohio St. 3d 160, 166, at fn. 5; *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, 264; *State* v. *Bayless* (1976), 48 Ohio St.

2d 73, 106 [2 O.O.3d 249], vacated in part on other grounds (1978), 438 U.S. 911.

The view taken by the majority is an unusually narrow view of the harmless error doctrine and is also impractical as applied. Under the rule as applied within the case, little or no mistakenly admitted evidence could survive without being determined to be prejudicial. All evidence presented against an accused can, in some degree, be said to influence the jury and contribute to the verdict.

The majority's use of the direct quotation from *Chapman, supra,* at 23-24, is incomplete and does not, in fact, accurately represent the harmless error doctrine currently utilized by the United States Supreme Court. The full text of that quotation is as follows:

"An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot, *under Fahy,* be conceived of as harmless. Certainly error, constitutional error, in illegally admitting highly prejudicial evidence or comments, casts on someone other than the person prejudiced by it a burden to show that it was harmless." (Emphasis added.)

In *Fahy* v. *Connecticut* (1963), 375 U.S. 85, Chief Justice Warren concluded that harmless error was "not * * * whether there was sufficient evidence on which the petitioner *could have been convicted without the evidence complained of.* The question is whether there is a reasonable possibility that the evidence complained of *might have contributed* to the conviction." (Emphasis added.) *Id.* at 86-87. This overly sensitive test is the very one actually applied by the majority, and which was impliedly rejected in *Chapman.*

In *Harrington* v. *California* (1968), 395 U.S. 250, 254, the court declined to follow "the minority view in *Chapman* (386 U.S., at 42-45) that a departure from constitutional procedures should result in automatic reversal, regardless of the weight of the [other] evidence." Also, the dissenters in *Harrington* correctly observed the majority opinion as a departure from the "reasonable possibility that the evidence * * * might have contributed" test gleaned from the *Chapman* language and based on *Fahy.*

Further, the same dissenters felt that for an error to be harmless, "it must have made *no* contribution to a criminal conviction." *Harrington, supra,* at 255 (Brennan, J., dissenting). This view I believe to have been rejected by the *Harrington* majority. They asserted that whenever the other untainted evidence is overwhelmingly in support of a conviction, the tainted evidence is harmless. *Id.* at 254.

Additionally, in *United States* v. *Hasting* (1983), 461 U.S. 499, 508-509, it was stated that "taking into account the reality of a human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial. * * *" (Citations omitted.) *Chapman* was read to stand for the mere proposition that there now exists no *per se* rule of exclusion for constitutional errors and that

when "on the whole record, the error was harmless beyond a reasonable doubt," there should be no reversal. *Hasting, supra,* at 508.

In this discussion of what constitutes "harmless error," it must be pointed out that the present case is distinguishable from *Chapman* and other cases relied on by the majority. In *Chapman,* the error complained of was far more egregious than in the present case. There the prosecutor in closing continually attacked the defendant's failure to testify, which was a violation of defendant's Fifth and Fourteenth Amendment right to remain silent. In the present case, despite the majority's vague references to a violation of appellant's constitutional right to a fair trial, there is, in fact, no constitutional provision cited, nor could there be, for the error complained of is predicated on a right granted by statute, *i.e.,* R.C. 2945.42. Since the present case does not involve "trial errors which violate the Constitution," it does not "automatically call for reversal," which the majority standard herein would accomplish. See *Chapman, supra,* at 23, and *Harrington, supra,* at 252.

The correct standard of review to be applied here was set forth in *State* v. *Williams* (1983), 6 Ohio St. 3d 281. At paragraph six of the syllabus in *Williams,* it is stated that:

"Where * * * error in the admission of evidence is extant, such error is harmless beyond a reasonable doubt if the remaining evidence, standing alone, constitutes overwhelming proof of defendant's guilt."

Although not citing *Harrington, Williams* applied the analysis set forth in *Harrington* which was later affirmed in *Hasting. Williams* avoids the automatic reversal and requires an analysis of the entire record to determine whether the remaining untainted evidence may determine guilt.

In the case here, the majority also relies on Crim. R. 52(A) which defines harmless error as "[a]ny error * * * which does not affect substantial rights." It is reasoned that since appellant's statutory privilege was affected, the error is not harmless. This reasoning likewise treats a single error like an infectious disease which destroys the vitality of all other evidence. Such a *per se* application of Crim. R. 52(A) was laid to rest in *State* v. *Williams, supra.* In that case, the majority asserted that the Ohio Rules of Criminal Procedure, including Crim. R. 52(A), were subject to "the *Chapman* constitutionally oriented test." *Id.* at 287.

In order to hold that error is harmless, this court must review the entire record and determine "if the remaining evidence, standing alone, constitutes overwhelming proof of * * * guilt." *Williams, supra,* at paragraph six of the syllabus. See, also, *Hasting, supra,* at 510, and *Harrington, supra,* at 254. Because the record is lengthy and the facts are interwoven in a complex fashion, it is necessary to fully set forth the evidence.

It must initially be determined what portion of the wife's testimony regarding the morning's events should be excluded from further consideration. Clearly, the wife is entitled to relate that she and appellant went to the welfare office, and did so to investigate the suspected theft of

the family's food stamps. She may also relate that the food stamps were expected on Saturday, but did not arrive. The conversation at the welfare office is admissible since it was between appellant, his wife, and a welfare officer. They discussed whether the victim may have stolen the family's food stamp allotment, and the fact that the food stamps were missing. The welfare officer indicated that the food stamps may actually have been sent out in the victim's name by mistake.

While Mrs. Rahman should not have testified to the contents of her later communications with appellant in the automobile, the fact of appellant's anger and consequent erratic driving is certainly admissible since it was an "act done in the known presence or hearing of a third person * * *." R.C. 2945.42. It can hardly be contended that such actions done publicly, with no regard for who observed them, could be expected to receive consideration as private marital communications. The same holds true with regard to the anger exhibited by appellant which occurred outside the welfare office. Where there was no attempt to make a confidential communication or act, the courts of this state can hardly be expected to infer one. Thus, with no reference to any confidential communication, there are sufficient available, untainted facts to prove appellant's intense anger at the victim after the visit to the welfare office.

Furthermore, the testimony offered at trial covered over six hundred pages. There were sixteen witnesses other than the wife. Of the one hundred four pages of her testimony, her total testimony regarding the drive from the welfare office took exactly one page. An even smaller amount of that single page contains statements which are part of the privileged conversation. Nevertheless, the prosecutor's theory of the case was hardly that appellant murdered the victim from a sustained rage, which theory would have led to a verdict of voluntary manslaughter. Instead, the state proved that only appellant could have carried out the particular detailed acts attendant to the aggravated murder of DeWayne Taylor.

From the remaining five hundred ninety-nine plus pages of evidence, it would be, as a matter of simple arithmetic, impossible for anyone other than appellant to have committed the murder at issue. The victim was last seen alive in his bed at approximately nine o'clock on Monday morning. His body was discovered in the basement on the next afternoon. This approximates to thirty hours. The amount of time that appellant admitted to spending alone in the home, plus the time allowed for by the house being totally inaccessible, or by the presence of other family members, accounts for almost all of this time. There simply was no time for the murder, movement of the body, and the attendant clean-up to have been accomplished within any of the unaccounted-for time periods.

The extensive clean-up of the crime scene, including the victim's body, the murder weapons and premises, leads inescapably to the concluson that appellant committed this murder. DeWayne's murder was accomplished by five blows to the head by a blunt object, followed by eight stab wounds

to the chest. There is no dispute to the fact that this was done while the victim lay in his bed in the upstairs bedroom. This method of killing invariably causes a wide distribution of the victim's blood. However, the bedroom in which the murder occurred had comparatively few available bloodstains.

Almost all of those bloodstains found in the bedroom had been washed. While blood was discovered where it had splashed on the desk drawer handle, very little was found on the walls around the bed. Several large stains on the floor were completely washed such that the carpet remained water-soaked when police later inspected the bedroom. Blood was also discovered on the doorposts of the basement door as well as on the back porch and steps. Nearly all of the bloodstains were so thoroughly cleaned that they would not react to many of the typical lab tests.

The victim's body was removed from the bed, taken down the stairs, out the back door, over the porch, and down the steps into the basement. The bloody bedsheets were removed and the mattress was cleaned. The victim was found, semi-garbed, in clothing that had no bloodstains. This indicated that his clothing had been changed. The bloody bedsheets and victim's clothing were disposed of. The weapons utilized were cleaned and either disposed of or hidden. Finally, when the body was discovered lying in the basement, it was surrounded by water and there was testimony that it had been washed down at that very location.

An ordinary murderer would simply have left the body where the killing occurred, and fled. The obvious, clear and sole implication was that only one who lived in the house, who wished to cover evidence that the murder had occurred in the home, would have gone to all the trouble of removing the large amount of evidence. Nor could the above labors have been done quickly. Further, these actions could only have been the beginning portion of a plan to ultimately dispose of the body. The fact that the body was being kept overnight in the basement, apparently under lock and key, indicates that the murderer was close at hand and had control of access to the basement.

The evidence indicated conclusively that the victim had to have died on Monday morning. The coroner's testimony was that, due to the degree of rigor mortis remaining in the victim's body, the murder must have been committed before 3:00 a.m., Tuesday morning, and probably sometime before Monday midnight. As previously mentioned, the time between Monday afternoon and Tuesday morning was accounted for by the presence in the home of other family members. Testimony also established that the home was inaccessible from about 11:30 a.m. Monday morning until early Monday evening. Also, that the victim was last seen in bed and was murdered in bed indicates that the murder occurred before he got out of bed on Monday morning. The victim was not seen alive by any family member after Monday morning. Finally, a new, large blood stain was observed in the bedroom for the first time on Monday night, when a rug

which had been placed over it was accidentally kicked aside. The witness was positive that the blood was not there the day before.

With these factors in view, appellant's presence and activities in the home Monday morning have very powerful significance. Due to her anxiety from the welfare office meeting, appellant's wife returned home about 11:15 on Monday morning. She discovered that all the doors in the house were locked, and the door to which she had a key was double-locked from the inside. This was most unusual, and there were several witnesses who said that appellant never bothered to lock the doors while he was home during the day. The wife knocked loudly and called out minutes before appellant finally answered from the top of the stairway next to the upstairs bedroom. After some five minutes passed, he opened the back kitchen door, but just as the wife entered, appellant suggested that they go for a drive. The wife observed that he was covered with sweat. She also noticed that the back porch and the basement steps, over which DeWayne's body was moved, had just been washed. Both the porch and steps were still wet. The only conclusion which a reasonable juror could draw from such facts is that appellant was, that very morning, engaged in cleaning up evidence of his crime.

Later that day, when the children came home from school, they found all the doors locked; one of them had a key which he tried. As earlier, the key would not work and the inside lock was observed to be on. Their testimony was that the doors were always kept unlocked for them. It becomes obvious that appellant wanted absolute control of the premises so that his clean-up efforts would remain undetected. Further, appellant denied that he double-locked the front door and stated that the front door was not double-locked at all on Monday. However, several witnesses testified to the contrary, including two who had keys to that door. Therefore, instead of merely impeaching his credibility, this transparent testimony was most inculpatory.

The basement had only one entrance which was an outside door in the back of the house. The family always kept this door locked since family valuables were stored there. There were only two keys to the lock, which were possessed by appellant and his wife. Also, police officers testified that because this door was improperly fastened to the bottom hinge, it required two of them to lock the door; one to lift it into place, and the other to engage the lock. However, appellant, because of his unusual strength, customarily opened and closed this door by himself. It is apparent that the body had been placed in the basement shortly after the murder and remained unmoved until discovery. When the body was discovered on Tuesday afternoon, it was observed that the door had not been, in any way, forced open. Further, this was the first time that the door had been observed open since Sunday night, when appellant locked it. Thus, access to the area where the body was kept, during the time of its keeping, was controlled by only one person.

The most convincing and direct of all evidence presented was the blood-splattered shirt found discarded, along with a pair of pants, about a block from the home. The wife's strong and unequivocal testimony established the uniqueness of this particular shirt. It had unusual stitching, and was purchased by the wife as a gift for appellant. She had seen him wear it many times. She also identified appellant's needlework in various alterations on the pants. An area store security guard testified that she had observed appellant wearing a similar shirt. The undeniable inference is that appellant's clothing was worn during the commission of the murder and then disposed of as part of the general clean-up of evidence.

The small portion of the wife's testimony considered inadmissible could hardly have permeated the foregoing evidence. Nor did it constitute the only evidence as to the intense animosity and hostility between the appellant and the victim. Other testimony about their relationship established that bitterness existed between them. One witness asserted that the victim "didn't get along with him [appellant] too well. He didn't like his ways." Another stated "They didn't like each other. They always argued, and he [appellant] didn't want DeWayne staying there and things would come up missing." Also, the wife's untainted testimony described particulars of what can only be described as a bitter, ongoing feud between the victim and appellant. It could easily be concluded that murder resulted from their relationship.

After reviewing the balance of the untainted evidence, it must be concluded that the *Williams* test is more than met. Surely, there could be no reasonable doubt in any juror's mind that Abdallah Rahman, a.k.a. Leroy Smiley, brutally murdered his stepson. Accordingly, I would affirm the judgment of the court of appeals.

DOUGLAS, J., concurs in the foregoing dissenting opinion.