[Cite as *State v. Wynn*, 2020-Ohio-3550.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                                     Court of Appeals No. L-19-1003

      Appellee                                          Trial Court No. CR0201802293

v.

Terrell Wynn                                               **DECISION AND JUDGMENT**

      Appellant                                          Decided:  June 30, 2020

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Edward J. Stechschulte, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Appellant, Terrell Wynn, appeals the judgment of the Lucas County Court of

Common Pleas, convicting him, following a jury trial, of four counts of rape in violation

of R.C. 2907.02(A)(2) and (B), and sentencing him to a combined prison term of 40

years.  For the reasons that follow, we affirm.

## I.  Facts and Procedural Background

{¶ 2} On July 13, 2018, the Lucas County Grand Jury indicted appellant on four counts of rape in violation of R.C. 2907.02(A)(2) and (B), felonies of the first degree. Each of the counts pertained to a different incident:

> Count One alleged that on or around April 15, 2018, appellant raped D.J.

> Count Two alleged that on or around May 11, 2018, appellant raped S.W.

> Count Three alleged that on or around May 30, 2018, appellant raped S.M.

> Count Four alleged that on or around June 16, 2018, appellant raped H.C.

{¶ 3} The matter proceeded to a five-day jury trial, commencing on November 26, 2018.  The following evidence was presented at the trial.

{¶ 4} D.J. testified that on April 14, 2018, she was earning extra money as an escort, advertising on the website "Skip the Games."  Through the website, she met a person named "Tape," later identified as appellant.  She agreed to meet appellant the next day for an "oral car date," for which she would charge $60.  The two exchanged text messages, and Tape picked her up in a "mini foreign gray SUV" with a Michigan license plate.  They then drove to a location behind a party store, where D.J. performed oral sex on appellant.  Appellant never paid D.J. the agreed upon $60.

2.

{¶ 5} After the oral sex, appellant drove D.J. to a car wash, and parked in one of the bays. D.J. testified that when she tried to leave, appellant showed her a gun in the glove box and told her that she was not going anywhere until he was finished with her. Appellant then ordered D.J. into the back seat. D.J. described that appellant had her head pinned to the floor and that he penetrated her very roughly. She told him to stop, but he did not. Appellant finished, and then a few minutes later penetrated her for a second time. D.J. stated that appellant had his knee in her chest, and was very forceful and aggressive. D.J. recounted that appellant kept asking her how it felt to be with an animal. Crying and upset, D.J. again told appellant no, but he did not stop. After a few more minutes, appellant penetrated D.J. for a third time, this time anally.

{¶ 6} When appellant was finished, he told D.J. to climb out of the car window. Appellant then offered D.J. her purse and shoes, holding them out on one side of the car until she approached, then moving them to the other side of the car and making her walk around to get them. D.J. stated that appellant repeated this about four times. Appellant then threw the purse and shoes out of the window and drove away. D.J. ran to the party store and the police were called.

{¶ 7} After the police were called, D.J. went to St. Vincent's Hospital where a rape kit was performed. The SANE nurse who examined D.J. at St. Vincent's Hospital testified that D.J. was very tearful during the examination. As part of the examination, the nurse found trauma at the 12:00 position of D.J.'s anal opening. A subsequent DNA analysis confirmed that appellant's DNA was present in D.J.'s vaginal area.

3.

{¶ 8} Finally, D.J. testified that she has never accused anyone of rape prior to appellant. Further, D.J. testified that she did not know the other victims, S.W., H.C., or S.M.

{¶ 9} On cross-examination, D.J. admitted that she originally told the police and hospital staff that she met appellant at a gas station. She explained that she did not want to disclose that she was working as an escort. D.J. also acknowledged that while she told police and the SANE nurse that appellant had choked her, she did not use those particular words during her testimony. Further, the SANE nursed did not discover any visible signs of injury on D.J.'s neck.

{¶ 10} The state next called S.W. as a witness. S.W. testified that she met appellant on May 11, 2018, in response to an advertisement that she placed on the website "Skip the Games." S.W. agreed to meet appellant for a car date. When she met him, appellant was driving a silver hatchback. After driving around for a little bit, appellant parked, and the two started going back and forth about the money.

{¶ 11} S.W. testified that the next thing she knew, appellant grabbed her by the neck and pulled her into the back of the car. S.W. said "Don't kill me. Don't kill me," and appellant replied that he would not kill her. S.W. testified that she then just gave up and let him have it however he wanted because she was stuck and if she knew that she was not going to die there was no point fighting it. At first, appellant forced S.W. to perform oral sex, then he moved to penetrating her. Appellant then told S.W. to get on top of him, but she told him that her legs hurt. Appellant threatened that if S.W. did not

4.

do what he wanted, he was going to take her to five other people who would do the same thing to her.

{¶ 12} While appellant was penetrating S.W. from behind, the car door opened and S.W. tried to get away. Appellant then grabbed her by the neck, and started squeezing it extremely hard. When appellant finished, he said, "[I]f you want to run so fast, run," and then pushed S.W. out of the car. S.W. then demanded her phone, but appellant jumped in the front seat of the car and drove away.

{¶ 13} S.W. ran to her brother's house, which was nearby, and her brother took her home. Once home, S.W.'s husband and brother convinced her to call the police. S.W. testified that the police wanted her to go to Toledo Hospital to have a rape kit performed, but they would not wait there for her to give her a ride back home. Not wanting to walk home from the hospital at 2:00 a.m., S.W. refused.[1] On cross-examination, S.W. also explained that she initially did not believe that they would find any of appellant's DNA because he used a condom, and also because she had been with five other men earlier that day.

{¶ 14} Finally, S.W. testified that aside from the incident with appellant, she has never filed a police report accusing someone of rape. In addition, S.W. testified that she did not know D.J., S.M., or H.C.

---

[1] S.W. was unaware that the hospital would have called a cab for her to take her home.

{¶ 15} H.C. testified next.[2]  H.C. also testified that she met appellant in response to her advertisement on the website "Skip the Games."  H.C. agreed for appellant to pick her up from her house, and he arrived in what she described as a silver hatchback.  H.C. testified that after driving around for a little bit, appellant stopped the car, and opened the back tailgate.  H.C. described that after they both took a drink of vodka in the back of the car, she brought up the issue of money, and that is when appellant began to "grab [her] up" and tried to rape her.  H.C. tried to run, but appellant held her down.  She said that she could not breathe, and appellant replied "that was the point."  H.C. told him no, but appellant held her down and penetrated her.  When he finished, appellant drove away and threw H.C.'s purse and phone out of the car.  H.C. chased after him screaming.  Once she retrieved her phone she called the police.

{¶ 16} H.C. then went to the hospital to have a rape kit performed, but ultimately left because the hospital staff was treating her badly.  However, H.C. returned a couple of days later and had the kit performed.  As part of the examination, several photographs were taken depicting cuts and bruises to H.C.'s body, arms, and hands.  Notably, the SANE nurse testified that H.C. denied that she was choked, and there was no physical evidence of H.C. having been choked.  Further, DNA testing was performed, and while the testing indicated the presence of male DNA, it was unsuitable for comparison.

---

[2] Notably, throughout H.C.'s testimony, she hurled numerous invectives at appellant. Following her testimony, H.C. left the witness stand and "flipped off the Defendant."

6.

{¶ 17} Finally, H.C. testified that she has never before filed a police report accusing someone of rape. Further, she testified that she did not know D.J., S.W., or S.M.

{¶ 18} The next witness to testify for the state was S.M. S.M. testified that on May 30, 2018, she agreed to meet a man named "Mark" that she met on a dating website called "Fast Meet."[3] S.M. later identified "Mark" as appellant. Unlike the other victims, S.M. testified that she was not an escort, and that she did not offer sexual services in exchange for money. Appellant was supposed to pick up S.M. and take her for coffee. However, when appellant picked her up in his silver small SUV, he drove her to a place with loading docks.

{¶ 19} S.M. testified that appellant physically forced her into the backseat of the car, explaining that he hit her head several times with his fist. S.M. tried to fight back, but appellant was holding her arm. During the scuffle, S.M. hit her head against the side of the car. S.M. testified that she realized the more aggressive that she got, the more aggressive appellant became. So, S.M. went into "survival mode," and just let appellant have what he wanted. S.M. described that appellant forced her to have oral sex with him, and when she said no, he would hit her in the head. Appellant then vaginally penetrated S.M. When he was done, appellant threw S.M. out of the car and drove away.

---

[3] At other points in the trial, the website is referred to as "Meet Me."

7.

{¶ 20} S.M. ran to a nearby church and called the police. S.M. then went to St. Vincent's Hospital to have a rape kit performed. Appellant's DNA was found in vaginal samples taken from S.M. In addition, pictures taken during the examination showed a scratch on S.M.'s wrist, a large lump on the back of her head, and bruises that were beginning to form on her arms.

{¶ 21} Finally, S.M. testified that, other than appellant, she has never accused someone of rape. Further, she testified that she did not know D.J., S.W., or H.C.

{¶ 22} On cross-examination, S.M. admitted that she told the police that she voluntarily got into the backseat of the car. However, on redirect, S.M. testified that she got into the backseat because appellant told her that he was stopping to pick up a friend.

{¶ 23} The final witness to testify was Toledo Police Detective Michael Talton. Talton testified that H.C. provided a phone number for the suspect, which public records revealed was attached to appellant. A later search of appellant's cell phone revealed the text messages between him and the victims on the dates that the victims filed their initial police reports. Talton also testified that a photo array was administered to all of the victims, and all of the victims separately identified appellant. Further, Talton discovered that a small silver SUV was registered to appellant's mother. In addition, Talton testified that appellant's DNA was connected to the rape kits performed on D.J. and S.M.

{¶ 24} Thereafter, the state played Talton's recorded interview with appellant. In the interview, appellant believed that the women fabricated their allegations against him because he did not pay them. Appellant then explained that this happened to him one

8.

time before in Wayne, Michigan, where he met a woman and had consensual sex, after which the woman demanded money and appellant refused to pay. Appellant stated that in all four of the current occasions, he picked up the women, the women did not ask him about money at the beginning, they had consensual sex, and then they asked him for money afterwards, and he refused to pay.

{¶ 25} Following Talton's testimony, the state rested. Appellant then moved for an acquittal pursuant to Crim.R. 29(A), which was denied. Appellant then rested without calling any witnesses. After closing arguments and jury instructions, the jury deliberated and returned with a verdict of guilty as to all four counts.

{¶ 26} Sentencing was held on December 13, 2018. The trial court ordered appellant to serve ten years in prison on each count, with those terms to be served consecutively to one another, for a total prison term of 40 years. In ordering the terms to be served consecutively, the trial court found that consecutive sentences were necessary to protect the public from future crimes, as well as to punish appellant. In addition, the court found that consecutive sentences were not disproportionate to the seriousness of appellant's conduct, or to the danger that appellant posed to the community. Finally, the court found that the harm caused was so great and unusual that a single prison term for any of the offenses committed as part of the course of conduct would not adequately reflect the seriousness of appellant's conduct. In support of its findings, the court noted the "chilling" fact that four separate, unrelated women each recounted a similar instance

of appellant forcefully and aggressively raping them, all of which occurred over the course of only a couple of months.

## II. Assignments of Error

{¶ 27} Appellant has timely appealed his judgment of conviction, and now asserts three assignments of error for our review:

1. Appellant's convictions are against the manifest weight of the evidence.

2. The trial court erred in permitting the admission of Evid.R. 404(B) evidence taken from appellant's videotaped interview with a detective.

3. Appellant's sentence is clearly and convincingly not supported by the record.

## III. Analysis

## A. Manifest Weight

{¶ 28} In his first assignment of error, appellant argues that his convictions are against the manifest weight of the evidence. When reviewing a manifest weight claim,

[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a

10.

new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.

*State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 29} Here, appellant was charged with rape under R.C. 2907.02(A)(2), which provides, "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

{¶ 30} In support of his assignment of error, appellant argues that the victims' testimony is inconsistent and unreliable. In particular, appellant argues that D.J. lied to the police and to the hospital staff when she denied being an escort. He further asserts that D.J. provided untruthful testimony when she testified that she told the hospital staff the full truth, only to later admit that she did not tell the hospital staff that she was working as an escort. Next, appellant argues that S.W.'s version of the events strains credibility because there was no physical evidence to support the attack that she describes. As to H.C., appellant argues that she testified that she was strangled during the rape, but the SANE nurse testified that H.C. denied strangulation at the time and there was no physical evidence of strangulation. Finally, appellant argues that S.M. testified that she was forced into the backseat only to later acknowledge that she got into the backseat voluntarily. In addition, appellant points to S.M.'s testimony that her assailant had tribal tattoos on his arms, but appellant presented his arms to the jury and there were no such tattoos.

11.

{¶ 31} Upon our review of the record, we find that the jury did not clearly lose its way and create a manifest miscarriage of justice warranting dismissal. While appellant notes minor perceived inconsistencies in the women's testimony, the overwhelming weight of the evidence supports the jury's finding of guilty. Each of the victims described in detail the events of the rapes. The credibility of the victims is bolstered by the similarity of the crimes, despite the fact that the women are unknown to each other. Furthermore, adding to the victims' credibility is the fact that D.J., S.W., and S.M. immediately called the police after the encounter, and H.C. called the police a short time later. D.J. and S.M. then went to the hospital to have rape kits performed and the SANE nurses testified that the victims were crying, shaken, and upset. The rape kit examinations also revealed physical injuries consistent with the rape allegations. Finally, appellant's assertion in the recorded interview that he met the women for consensual sex, after which the women demanded money and appellant refused to pay is belied by the text messages showing that appellant agreed at the outset to pay money for certain sexual services. Therefore, we find that this is not the exceptional case in which the evidence weighs heavily against the convictions, and we hold that appellant's convictions are not against the manifest weight of the evidence.

{¶ 32} Accordingly, appellant's first assignment of error is not well-taken.

## B. Evidence of Prior Bad Acts

{¶ 33} In his second assignment of error, appellant argues that the trial court erred by allowing evidence of prior bad acts. Specifically, appellant argues that his statements

12.

in the recorded interview alluding to a previous false accusation in Wayne, Michigan, were inadmissible.

{¶ 34} In reviewing this issue, we note that "[t]he trial court has broad discretion in the admission * * * of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere." *State v. Lowe*, 69 Ohio St.3d 527, 532, 634 N.E.2d 616 (1994). An abuse of discretion connotes that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶ 35} Evid.R. 404(B) provides, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

{¶ 36} At the outset, the state argues that appellant's statements regarding what happened in Wayne, Michigan, are not evidence of prior bad acts used to show action in conformity therewith. We disagree. The difficult part of appellant's statement regarding the false accusation in Wayne, Michigan, is the fact that it leads to competing inferences. On the one hand, if believed, appellant's testimony is actually evidence of the lack of prior bad acts in that there is absolutely no evidence that appellant ever raped anyone in Wayne, Michigan. On the other hand, the evidence in the record effectively creates a reinforcement loop where a reasonable juror could believe that appellant raped the

13.

victims in the current case, which would lead the juror to conclude that appellant was lying about the Michigan allegation being false and that appellant in fact did rape a woman in Michigan, which would bolster the juror's conclusion that appellant acted in conformity therewith and raped the victims in the current case. Because of this reinforcement loop, which is akin to the old adage that where there is smoke there is fire, we hold that evidence of prior false accusations of the crime for which appellant is on trial constitutes evidence of prior bad acts.

{¶ 37} Nonetheless, we find that appellant was not prejudiced by the admission of the other-acts evidence. "The question is whether an improper admission affects the defendant's 'substantial rights' so that a new trial is required as a remedy." *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 26. If not, the error may be disregarded as harmless error. *Id.* at ¶ 25. Importantly, we must find that the error was harmless beyond a reasonable doubt. *Id.* at ¶ 28. In determining whether an error is harmless beyond a reasonable doubt, we "must excise the improper evidence from the record and then look to the remaining evidence." *Id.* at ¶ 29. "[T]he cases where imposition of harmless error is appropriate must involve either overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction." *Id.*, quoting *State v. Rahman*, 23 Ohio St.3d 146, 151, 492 N.E.2d 401 (1986).

{¶ 38} In this case, as discussed above in appellant's first assignment of error, there is overwhelming evidence that appellant is guilty of raping the four victims. Furthermore, any prejudicial impact by the admission of appellant's statements is slight,

14.

given that the prosecutor did not highlight these statements during the trial or in closing, and given that there is no actual evidence of prior wrongdoing, only an inference based upon a conclusion that appellant is lying in his statements, which conclusion is reached in part upon the abundant evidence of guilt in the present case. Therefore, we hold that any error in admitting appellant's statements regarding a prior false accusation in Wayne, Michigan, is harmless beyond a reasonable doubt.

{¶ 39} Accordingly, appellant's second assignment of error is not well-taken.

### C. Consecutive Sentences

{¶ 40} In his third, and final, assignment of error, appellant argues that the trial court's imposition of consecutive sentences is clearly and convincingly not supported by the record.

{¶ 41} "Where the appellant challenges the trial court's imposition of consecutive sentences, we are bound to review the issue under R.C. 2953.08(G)(2)(a), and must affirm the trial court unless we clearly and convincingly find '[t]hat the record does not support the sentencing court's findings under division * * * (C)(4) of section 2929.14.'" *State v. Taylor*, 6th Dist. Wood No. WD-19-009, 2020-Ohio-404, ¶ 14. R.C. 2929.14(C)(4) requires a trial court to find

> that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the

danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 42} Appellant first argues that the trial court did not make the required finding under R.C. 2929.14(C)(4)(b) that "[a]t least two of the multiple offenses were committed as part of one or more courses of conduct." Indeed, on this prong, the trial court stated in its sentencing entry only that "the harm caused was great or unusual such that no single prison term is adequate."

**{¶ 43}** Applicable here, the Ohio Supreme Court has instructed,

> [T]he court should * * * incorporate its statutory findings into the sentencing entry. However, a word-for-word recitation of the language of the statute is not required, and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld."

*State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 29. In this case, it is clear that the trial court engaged in the correct analysis in that while it omitted the "course of conduct" language in its sentencing entry, it quoted other portions of R.C. 2929.14(C)(4)(b) finding that the harm caused was "so great or unusual" that no single prison term would be adequate. Furthermore, the trial court's sentencing entry is consistent with the sentencing hearing, at which the court did specifically note that the offenses were committed as part of one or more courses of conduct. Thus, we find that appellant's first argument is without merit.

**{¶ 44}** Second, appellant urges us to adopt the reasoning of *State v. Kay*, 2d Dist. Montgomery No. 26344, 2015-Ohio-4403, ¶ 19, that an offender must have "engaged in a course of conduct that made the harm resulting from [his] offenses more egregious or unusual." *See also State v. Johnson*, 8th Dist. Cuyahoga No. 102449, 2016-Ohio-1536, ¶ 21 (citing *Kay* with approval, and finding that there was nothing in the record to indicate "that the 'course of conduct' elevated the seriousness of the crimes"). In *Kay*,

17.

the defendant was involved in an armed robbery of her friend that went awry, resulting in the friend being shot to death. A few hours later, the defendant then took the proceeds of the robbery to the casino where she gambled some of the money away. Thereafter, the defendant destroyed evidence by pushing the getaway car from the robbery into a lake. At a resentencing hearing, the trial court ordered the defendant's sentences for the various crimes to be served consecutively, finding that the harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflected the seriousness of the defendant's conduct. *Kay* at ¶ 7.

{¶ 45} On appeal, the Second District reversed the imposition of consecutive sentences. The Second District reasoned that the focus of R.C. 2929.14(C)(4)(b) is "the 'so great or unusual' finding required to distinguish this offense from other identical offenses, and how this offense was part of a 'course of conduct,' which elevates the seriousness of the crime and the need for greater punishment." *Id.* at ¶ 18. According to the Second District, "[R.C. 2929.14(C)(4)(b)] requires a finding that the course of conduct surrounding all the multiple offenses resulted in harm more egregious or unusual than the harm resulting from other similar multiple offenses." *Id.* There, the court found that the only reference to the unusual nature of the harm was the defendant's callousness in losing the proceeds from the robbery at a casino on the same night the offenses were committed. *Id.* at ¶ 19. The court was "not persuaded that an offender's conduct in quickly losing the ill-gotten gains makes her offenses 'so great or unusual' that

consecutive sentences are mandated." *Id.* Thus, the Second District held that the record failed to support the trial court's finding under R.C. 2929.14(C)(4)(b).

{¶ 46} We reject the reasoning set forth by the Second District in *Kay*. As pointed out by the state, the plain language of R.C. 2929.14(C)(4)(b) does not require that the "course of conduct" results in harm that is more egregious or unusual. Instead, the statute requires that "the harm caused by two or more of *the multiple offenses* so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct." (Emphasis added.) R.C. 2929.14(C)(4)(b). Thus, it is the harm caused by the multiple offenses that is the focus of the statute, not the fact that the offenses were committed as part of a course of conduct. If the harm caused by the multiple offenses is so great that no single prison term for any one of the offenses adequately reflects the seriousness of the offender's conduct, then consecutive sentences may be appropriate.

{¶ 47} Here, based upon the testimony taken at trial, the trial court determined that the harm caused to the four victims was so great that a single prison term for one of the offenses did not adequately reflect the seriousness of appellant's conduct. We agree. Over the course of approximately two months, appellant forcefully and violently raped four different women, taking particular pleasure in the aggressive nature of the rapes. Moreover, the transcript reveals that each of the women suffered significant emotional and physical trauma at the hands of appellant. Thus, we find that the trial court's findings

19.

under R.C. 2929.14(C)(4) are not clearly and convincingly unsupported by the record. Therefore, appellant's second argument is without merit.

{¶ 48} Finally, appellant passingly argues that the trial court did not state any facts that would support such a lengthy sentence in consideration of R.C. 2929.11 and 2929.12. However, "R.C. 2929.11 and 2929.12 are not applicable to a review of consecutive sentences." *Taylor*, 6th Dist. Wood No. WD-19-009, 2020-Ohio-404, at ¶ 12, citing *State v. Gwynne*, 158 Ohio St.3d 279, 2019-Ohio-4761, 141 N.E.3d 169, ¶ 16-18. Therefore, appellant's third argument is without merit.

{¶ 49} Accordingly, appellant's third assignment of error is not well-taken.

### IV.  Conclusion

{¶ 50} For the foregoing reasons, we find that substantial justice has been done the party complaining, and the judgment of the Lucas County Court of Common Pleas is affirmed.  Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J. _____

_____
JUDGE

Arlene Singer, J. _____

_____

Gene A. Zmuda, P.J. _____
CONCUR.

JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.