[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION AND JUDGMENT ENTRY
This case is on appeal from the May 5, 1997 judgment of the Lucas County Court of Common Pleas, which sentenced appellant, Jermain Covington, following his conviction on charges of aggravated murder, in violation of R.C. 2923.01(A) and conspiracy to commit aggravated murder, in violation of R.C. 2923.01. On appeal, appellant asserts the following assignments of error:
"FIRST ASSIGNMENT OF ERROR
 "THE TRIAL COURT ERRED IN NOT GRANTING MR. COVINGTON'S MOTION TO DISMISS FOR VIOLATION OF HIS RIGHT TO A SPEEDY TRIAL AS SET FORTH IN R.C. 2945.71.
"SECOND ASSIGNMENT OF ERROR
 "THERE WAS INSUFFICIENT EVIDENCE TO CONVICT MR. COVINGTON OF THE AGGRAVATED MURDER OF DESTINY ELMORE OR THE CONSPIRACY TO KILL HER OR EDWARD KING AND HIS CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
"THIRD ASSIGNMENT OF ERROR
 "THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING PHOTOGRAPHS OF THE DINING ROOM AND KITCHEN OF 928 PAGE STREET WHEN THE PHOTOGRAPHS INACCURATELY DEPICTED THE SCENE AS IT WAS AT THE TIME OF DESTINY ELMORE'S MURDER.
"FOURTH ASSIGNMENT OF ERROR
 "THE TRIAL IN THIS CASE WAS TAINTED BY PROSECUTORIAL MISCONDUCT WHICH RESULTED IN AN UNFAIR TRIAL AND UNRELIABLE VERDICTS.
"FIFTH ASSIGNMENT OF ERROR
 "INSOFAR AS ANY ERROR COMPLAINED OF WAS NOT ADEQUATELY PRESERVED BELOW, MR. COVINGTON WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL."
In his first assignment of error, appellant argues that the trial court erred by not granting his motion to dismiss based on a violation of his statutory speedy trial right set forth in R.C. 2945.71.
Appellant was arrested and incarcerated on January 6, 1997 and was held in lieu of bail until his trial. On January 16, 1997, he was indicted on charges of aggravated murder of Destiny Elmore and conspiracy to commit aggravated murder of Destiny Elmore and/or Edward King. Arraignment was scheduled for January 21, 1997. At that time, the court noted that appellant had retained counsel. Appellant requested a pretrial hearing, which was scheduled for February 14, 1997. At the prehearing conference, appellant was represented by the same attorney and requested a trial date of April 7, 1997. Appellant waived any speedy trial right to have a trial on April 6, 1997, which was ninety days after his arrest and incarceration. A second pretrial hearing was scheduled for March 7, 1997 at appellant's request.
On February 25, 1997, appellant's counsel moved to withdraw as appellant's counsel for the reason that appellant had failed to retain him. This motion was granted on March 7, 1997, and new counsel was appointed to represent appellant by the same order. Defendant requested another pretrial hearing for March 17, 1997.
On March 14, 1997, appellant moved to sever his trial from that of his co-defendants and requested a hearing on the issue. Following a hearing on March 17, 1997, appellant's motion was denied. At appellant's request, the case was continued to March 24, 1997 for trial depositions.
The appearance docket indicates that a pretrial was held on April 2, 1997, and that an order was issued during that hearing. However, there is no transcript of the hearing nor an order of that date in the record.
On April 3, 1997, the prosecution moved to vacate the April 7, 1997 trial date and reset appellant's trial to a new date, which was the same trial date as his co-defendants. Appellant opposed the motion and filed a memorandum in opposition on the same date. A pretrial hearing on the motion was held on April 4, 1997.
At that hearing, however, a different issue was raised. The court indicated that the continuance of appellant's trial date for two days was due to the reasonable necessity of deposing certain witnesses needed for trial of appellant's co-defendants. These witnesses were being held in protective custody and the prosecution did not want to keep them in protective custody until June 1997, when the trial of the co-defendants was scheduled. The April 7, 1997 date was the only date convenient for all of the attorneys involved. Furthermore, the court noted that the three days needed to decide appellant's motion to sever tolled the running of the speedy trial statute for three days.
However, the court issued an order on that date stating in pertinent part as follows: "At defendant's request [sic] matter set for trial on April 9, 1997 at 9:00 a.m. State's motion to continue is denied." This order was not journalized and need not have been since it was not a judgment of conviction. Crim.R. 32(C).
On April 9, 1997, appellant moved to dismiss the charges against him on the ground that his speedy trial rights had been violated.
Pursuant to R.C. 2945.71(C) (2), a defendant charged with a felony must be brought to trial within two hundred seventy days after his arrest. For purposes of calculating this time, every day the defendant is held in jail in lieu of bail, is counted as three days. R.C. 2945.71(E). Since in the case before us appellant was held in jail in lieu of bond, his trial was required to be held on or before ninety days after his arrest.
While the statutory time limits for bringing a defendant to trial are flexible, the time can only be extended for the reasons permitted by R.C. 2945.72. State v. Mincy (1982), 2 Ohio St.3d 6,7. The statutory exceptions to speedy trial time limits are to be strictly construed against the state. State v. Pachay
(1980), 64 Ohio St.2d 218, 221, and State v. Singer (1977),50 Ohio St.2d 103, 109. The relevant sections of the statute raised in this case are R.C. 2945.72(C), "* * * delay necessitated by the accused's lack of counsel, * * *;" R.C. 2945.72(E), "* * * delay necessitated by reason of a * * * motion * * * or action made or instituted by the accused;" and R.C. 2945.72(H), "* * * the period of any reasonable continuance granted other than upon the accused's own motion."
Applying the ninety-day time limit and appellant's one-day waiver of his speedy trial right, appellant was entitled to be brought to trial by April 7, 1997. However, his trial occurred two days later on April 9, 1997. Having made a prima facie showing that his speedy trial rights had been violated, the burden was on the prosecution to demonstrate that the speedy trial time limit was extended pursuant to one of the exceptions under R.C.2945.72. State v. Geraldo (1983), 13 Ohio App.3d 27, 28 and Statev. Friedhof (July 10, 1996), Medina App. No. 2505-M, unreported.
Appellant argues that his speedy trial time cannot be tolled by the filing of his motion to sever in March 1997, when that motion was filed prior to the date of trial and did not delay the date of trial. Furthermore, even if his motion could toll the speedy trial time, there was no specific finding by the court that the delay was reasonable and necessary. Appellee argues that we must interpret the statute as permitting the tolling of the speedy trial time even when the motion filed by the defendant did not affect the trial date. Otherwise, the statutory exception would only be applicable in a few extraordinary cases.
If a defendant files a motion, the speedy trial time is tolled only if the motion actually delays the proceedings. Statev. Singer, supra; State v. Short (June 18, 1999), Montgomery App. No. 17288, unreported; and State v. Jensen (June 30, 1995), Wood App. No. WD-94-099, unreported. The determination of whether an actual delay occurred is a question of fact, which the court must resolve and record its essential findings. State v. Frost (Dec. 11, 1992), Scioto App. No. 91-CA-1995, unreported.
We agree with appellant in the case before us that his motion to sever did not actually delay the proceedings. Since the motion was filed before the date set for trial and did not cause the court to change the trial date, we cannot find that the motion affected the date set for trial.
Appellant also contends that his speedy trial time cannot be tolled for the reason that he was unrepresented. While his first attorney withdrew from representation, another attorney was appointed by the same order which granted the motion to withdraw. Furthermore, appellant argues that his technical lack of legal representation did not cause the delay of his trial. Appellee argues, on the other hand, that from the time the first attorney entered his appearance (January 21, 1997) until he filed a motion to withdraw because he had never been retained as counsel (March 7, 1997), appellant was unrepresented. Therefore, appellee contends that the speedy trial time was tolled during this period.
We agree with appellant that the speedy trial time was not tolled by his lack of representation. While it is true that appellant was unrepresented at some point, counsel was immediately appointed when his prior counsel's motion to withdraw was granted. Again, appellant's lack of representation did not actually delay the proceedings in any way. Thus, we find that there was no delay in the proceedings attributable to appellant.
The final issue raised by appellant is whether the continuance granted by the trial court was a proper extension under R.C. 2945.72(H). On April 3, 1997, the prosecution moved to vacate the April 7, 1997 trial so that appellant could be tried along with his co-defendants who were seeking a continuance of the trial date. While some of the defendants were waiving their speedy trial rights and requesting a continuance of their trials, other co-defendants, including appellant, would not waive their speedy trial rights and were insisting on the April 7, 1997 trial date. The prosecution indicated in its motion that there was no speedy trial issues as to appellant and requested that the court continue his trial to a date selected for the other defendants.
R.C. 2945.72(H) gives the court the discretion to extend the speedy trial time for a reasonable time if necessary. Aurorav. Patrick (1980), 61 Ohio St.2d 107. The court may grant such a continuance either sua sponte or upon motion by the prosecution.State v. Lee (1976), 48 Ohio St.2d 208, syllabus, and State v.Saffell (1988), 35 Ohio St.3d 90. However, under both circumstances, the court must enter in its "journal" an order granting the continuance, stating the reasons for the continuance, and against whom it is chargeable before the expiration of the time limit prescribed in R.C. 2945.71. State v. Mincy, supra, at the syllabus, and State v. Lee, supra, syllabus. However, an older Ohio Supreme Court case which has not been overruled have indicated in dicta that the reasonableness of the continuance need only be ascertainable from the record. State v. McRae (1978),55 Ohio St.2d 149, 152-153.
While the Supreme Court of Ohio requires that the continuance and the reasons therefore must be in the court's journal entry, the only judgment which must be journalized in a criminal action is the judgment of conviction. Crim.R. 32(C). Nonetheless, we interpret these cases as holding that there must be an order signed by the judge which grants the continuance, indicates the reasons therefore, and indicates against whom the continuance is charged.
Several appellate courts have found that a court's continuance based upon the motion of the prosecution did toll the speedy trial time even though the "journal entry" did not state the reasons for the delay. State v. Walker (July 6, 1999), Licking App. No. 93CA00121, unreported (although the order was acceptable because it referred to the state's motion which outlined the reasons for the continuance, the continuance was not acceptable because neither it nor the record indicated the reason for the length of the delay) and State v. Short, supra (the order was acceptable because it appeared at the end of the state's motion so that the reasons for the continuance were clear and the phrase "next open trial date" was reasonable).
In this case, the court's order incorrectly indicates that the continuance was granted at appellant's request. Appellant clearly objected to any continuance, orally and by a memorandum in opposition to the state's motion. Therefore, there is no order indicating the actual reason for the continuance. While the pretrial hearing transcript records the reason for the continuance, we find that this is insufficient to toll the speedy trial right. We need not even reach the issue of whether the reasons for the continuance stated in the transcript were reasonable.
Nonetheless, we find that appellant's statutory speedy trial rights were not violated. At his arraignment, appellant requested that the court hold a pretrial hearing, which was granted by the trial court. The hearing was held twenty-four days later. Since appellant was not entitled to a pretrial hearing, but was granted one at the court's discretion, and it was held within a reasonable period of time, appellant's request tolled his statutory speedy trial right for twenty-four days.State v Adams (1989), 43 Ohio St.3d 67, 71 (Holmes, J., dissenting); State v. Gowe (1983), 13 Ohio App.3d 358, 359; andState v. Wirtanen (1996), 110 Ohio App.3d 604, 608. Had appellant not made this request, his trial date could have been scheduled at his arraignment. Therefore, we conclude that appellant's request for a pretrial hearing did delay the proceedings. Because of this fact, appellant was clearly brought to trial within the statutory time-frame.
Therefore, appellant's first assignment of error is not well-taken.
In his second assignment of error, appellant argues that his conviction was contrary to the manifest weight of the evidence. More specifically, he argues that there was insufficient evidence to support a finding that he participated or was involved in the aggravated murder of Elmore or conspired to commit her or King's murder.
A challenge to the weight of the evidence questions whether a greater amount of credible evidence was admitted to support the conviction than not. State v. Smith (1997), 80 Ohio St.3d 89,113, certiorari denied (1998), 523 U.S. 1125; and Statev. Thompkins (1997), 78 Ohio St.3d 380, 386-387.
Appellant argues that the only evidence presented as to Elmore's murder was that Carter was the leader of the gang and everyone did exactly what he said to do and that only one witness testified that appellant held a belt around Elmore's neck, but the witness could not remember if Elmore was alive at the time or not. As to King's murder, appellant argues that the only evidence presented was that of one witness who testified that he was present at the scene of the murder but was inattentive and evidence that appellant may have held King's gun the night before. Therefore, appellant concludes that the evidence shows only that he was present at one murder and perhaps at the second, that he was a member of the gang with a leader that they all obeyed. He contends that there was no evidence that he conspired to commit either murder. He also argues that the only evidence of his criminal intent was an inference drawn from evidence of his presence at the murders, his membership in the gang, and his conduct prior to the murders.
The following evidence was presented at trial. On August 18, 1996, a group of kids met at a home on Page Street in Toledo, Ohio, to become members of a gang, the blackstone rangers. The home was the residence of Ruth Ann Sanchez, Phillip Gott, and several members of Gott's extended family. The "inductees" included appellant's brother, Benjamin Wortham, Brandon Lewis, Martina Osley, Rashaana Torrez, Ruth Ann and Lori Sanchez, who were sisters and cousins of Torrez, and Destiny Elmore, Osley's cousin. The leader of the gang, Willie Carter, explained the gang's fundamental principles and performed the ceremony to initiate the kids into the gang. Assisting him were appellant, Phillip Gott, and Nathanial Bibbs. At trial Torrez, Ruth Ann and Lori Sanchez, and Brandon Lewis testified on behalf of the prosecution. Wortham testified on behalf of the defense.
Appellant served as chair of the men. He was responsible for keeping track of the male members. He was also the male figure who resided at the house at 1030 Moore Street, Toledo, Ohio, known as the "temple," where all the gang meetings were held. Appellant held the key to the safe in the basement, which housed the gang's marijuana. Bibbs and Gott were the enforcers or chief mufti. Torrez was chair of the women of the gang and kept the minutes of the meetings. Ruth Ann Sanchez was the treasurer.
There were rules or laws established by the gang that required various punishments for the violation of those rules. The determination of which punishment would be imposed would be made by the "heads," Carter, appellant, and Torrez. Death was also a potential punishment for any member who wanted to leave the gang or revealed the gang's activities to anyone who was not a member. The women in the gang were required to do all the housework at the Moore Street house and to be employed. They did not share in any of the funds earned through parties, the sale of marijuana, or other activities.
Before the initiation ceremony, Torrez drove Carter and Osley to pick up Bibbs. Carter questioned Torrez regarding Elmore's trustworthiness and Torrez indicated that she did not know Elmore well enough to give an opinion. Carter then discussed the issue with Osley, who indicated that Elmore could not be trusted. Carter stated that he was worried that Elmore was telling her boyfriend and his friend, who had recently been robbed, about the gang's whereabouts. After Bibbs was picked up, Carter and Bibbs discussed that something needed to be done to prevent Elmore from telling her boyfriend their whereabouts.
When the group arrived back at the house on Page Street, they joined everyone in the dinning room. Lewis testified that twenty minutes or so before they were initiated into the gang, he was in the kitchen with Wortham, appellant, Carter, and Gott. Carter whispered to them that one of the women was going to be killed that night.
Carter first taught everyone the gang handshake and prayer. After everyone had become a member of the gang, Carter indicated that he would hold an interview with each member. Carter told appellant and Gott to go to the kitchen. The testimony of the witnesses conflicted as to whether Bibbs was sent to the kitchen. Elmore was to be the first "interview." Carter followed everyone into the kitchen, stopping to pick up his belt which laid on top of the piano. He also reached for something else that laid on top of the piano, but neither Torrez nor Ruth Ann Sanchez could not see what it was. Lori Sanchez testified that she saw Carter pick up a gun.
The kids in the dining room could hear a rumble, like something was being hit along the cabinets or appliances and Elmore saying "okay, okay, enough" or "okay, okay, okay." Lewis heard Elmore screaming, but he could not see into the kitchen. Torrez recalled that while the noise was going on, Gott left the kitchen and went to Ruth Ann Sanchez, who was crying. Sanchez testified that Gott came out of the kitchen first and went to talk to Bibbs. Torrez, however, testified that Carter was second to come out of the kitchen followed by Bibbs.
When Ruth Ann Sanchez no longer heard any noise, she looked into the kitchen and saw Carter holding his belt around Elmore's neck. Elmore appeared unconscious or dead. Sanchez could see appellant leaning over Elmore with one arm on each side of her. Sanchez looked into the kitchen twice more. First she saw Carter holding the belt around Elmore's neck, then she saw appellant holding the belt around Elmore's neck from behind her. She could not tell if Elmore was dead, but could tell that she was not moving. Lori Sanchez also testified that after the noise stopped, she looked into the kitchen and saw Elmore laying on the floor. Her face was blue and her eyes were popping out of her head. Appellant was leaning over her holding one end of the belt around her neck.
After a few minutes, Bibbs stated that enough time had passed. Appellant and Elmore were still in the kitchen. Carter and Bibbs then went back into the kitchen and Torrez could hear them discussing what should be done with Elmore's body.
Torrez and the Sanchez sisters testified that Carter came out of the kitchen and told everyone that Elmore was an example of what would happen if anyone told someone else about the gang's activities. Lewis testified that after the noise stopped, Carter called them all into the kitchen to talk to them. Carter then called Torrez into the kitchen and told her to get her car with Osley and pull it to the end of the yard and open the car's trunk. Torrez did what Carter asked because she was afraid that he would kill her if she did not do it. Lori Sanchez testified Bibbs went and got a blanket from upstairs and took it into the kitchen. Wortham testified that Lori Sanchez got the blanket. Both Lori and Ruth Ann Sanchez saw Elmore's body passed through the dining room window. The kitchen windows did not open and the door was locked and no one had a key. Ruth Ann Sanchez testified that Bibbs moved Elmore by himself. Lori Sanchez testified that both Bibbs and Carter moved Elmore through the window. Torrez saw Bibbs and appellant carrying Elmore's body to the car.
Wortham and Lewis were told by Carter to go with Torrez and Osley. When the group arrived at the spot Carter had indicated, Wortham would not help Lewis move Elmore's body. Each witness testified differently as to what happened next. Either Osley or Torrez or all four helped to dump Elmore's body. Afterward, the group returned to the Page Street house as Carter had directed.
When they entered the house, Carter was going through the contents of Elmore's purse. He said that he was making sure that there was nothing to link her with any of them. Then he told Torrez to take the purse over to Elmore's boyfriend's house and leave it in his yard. Carter also directed Torrez, Lori and Ruth Ann Sanchez, and Osley to go to a certain nightclub afterward to be seen, but it was closed. Instead, they picked up some drinks and brought them back to the house.
A Toledo police officer testified that she found Elmore's body on August 20, 1996, around 10:00 a.m. in the area described by Torrez as the spot where they dumped Elmore's body. The deputy coroner testified that Elmore died as a result of strangulation and had been dead one and one-half to two days. She also indicated that there were a number of bruises on Elmore's body indicating that she struggled with her killer.
The murder of Edward King occurred on December 4, 1996. The following evidence was presented as to this crime.
Lamontie Gist testified that he was introduced to Roxanne Torrez by Carter as someone who had been selling him marijuana. Gist made arrangements with Roxanne Torrez to buy five pounds of marijuana from her. He had been instructed earlier by Carter to make such arrangements, with the intent to steal the marijuana from Torrez and split it with Carter.
When Gist got to the Elmore residence, Carter was not there and had failed to leave his gun as arranged. So, Gist asked Edward King if he could borrow King's gun. King was already at the home smoking marijuana when Gist arrived. King agreed to help Gist if he got a cut. Gist testified that Roxanne Torrez arrived while Gist and King were talking. Therefore, Gist was not able to rob her outside the house as planned. Instead, Gist and King went to the basement with her. While there, King pulled out his gun and took the marijuana.
Rashaana Torrez testified similarly, except that she stated that Roxanne arrived first that evening with her friend, Michelle, while Ruth Ann and Lori Sanchez, Dawn Rashley, Osley and Torrez were playing cards in the dinning room. Also in the room were Margaret and Suzanna Sanchez. Torrez later learned that Gott was home as well. Torrez testified that Roxanne usually only came over when one of the males was there, but said that she was there to meet someone. Five minutes later, Edward King arrived with Lamontie Gist. Roxanne, King, and Gist went to the basement. Three or four minutes later, Roxanne came upstairs crying and yelling that King and Gist had stolen five pounds of her marijuana at gunpoint.
After a short time, Carter arrived with Bibbs. Carter questioned Torrez as to how she could have let something like that happen in the house. She was in charge when appellant was absent. He also indicated that the group was going to benefit from the robbery. Carter, Roxanne, and Bibbs then left. Roxanne returned about an hour later stating that they could not find King or Gist.
Gist testified that when King and he got to Gist's apartment, they started smoking the marijuana they had stolen. Hamilton came over and joined them. About half an hour later, Carter, appellant, Bibbs, and Gott came over. Carter asked why King had been in on it. Gist explained the circumstances to Carter and King gave his share back, but they all smoked most of it away. Appellant was mad because Gist had robbed Roxanne inside the house. In a prior statement, Gist had stated that appellant had taken King's gun, but at trial he recalled that Carter had given the gun to someone else. Gist testified that he took King home that night. The next day Gist was supposed to take King to court the next morning but was late. He dropped King off at a house on Chestnut Street sometime around 8:50 a.m., about a block from the Elmore Street house.
About 8:30 the next morning, on December 4, Torrez found Carter, Bibbs, Gott, appellant, and King in the living room. Gott told her that King was returning part of the marijuana. She returned to her room and remained there for another hour or hour and a half. Then she went in search of Carter's cousin, Diarre Hamilton, who had spent the night with her. She found him in the basement with Carter. As she approached them, she saw King lying on the floor and Carter holding his belt around King's neck. Bibbs and appellant were also in the room. Appellant was busy rolling some marijuana. After a few minutes, Bibbs looked at his watch and said enough time had passed and then Hamilton let go of the belt. Torrez returned to her bedroom to get dressed.
While Torrez was upstairs she could hear a car in the driveway. When she went downstairs, she found Bibbs' girlfriend's (Octavia Jones') car backed completely up to the back door. Appellant stood by the car. Hamilton was carrying King's body up from the basement and placed him in the trunk of the car. King had on a jacket, with the hood pulled up over his head. Ruth Ann Sanchez also witnessed King's body being moved. Torrez testified that she turned around at one point and saw Sanchez standing behind her. She saw that King was in a fetal position and that his legs had been tied with speaker wire. She further testified that King had been at the Moore Street house before because he was closely associated with Rashaana Torrez, who testified that she did not know King personally.
Carter then told Torrez to drive the car. Torrez recalled leaving the house sometime around 10:15 a.m. Hamilton and Bibbs went with Torrez and directed her to the place where the body was dumped. When Bibbs and Hamilton got back into the car, they told her to go quickly. She stepped on the gas, but had forgotten to shift into drive, so the car's wheels spun. A police detective made casts of the tire impressions found near the area where King's body was found. The impressions indicated that a car had spun its back tires when it was either backing up or leaving the area. After comparing the casts to photographs of the tires on the car belonging to Octavia Jones, he concluded that her vehicle had been at the scene. Because the two rear tires on the car were different brands, the odds of another car having the same combination of tire brands were remote. Another police officer testified that she found King's body around 5:00 p.m. on December 4, 1996 lying in a fetal position with a brown hooded jacket covering his face and his hands and feet bound together. The deputy coroner testified that King died as a result of strangulation and had been dead three to four hours.
Torrez testified that after they got back to the house, Bibbs and Hamilton left and Carter told Torrez to clean up the basement. He also ordered Ruth Ann Sanchez to help her. Torrez did not know how much Sanchez knew about the murder, so Torrez tried to keep her from seeing the blood. Sanchez testified that she saw the blood stain.
Dawn Rashley, a woman who lived with appellant, testified on his behalf that appellant had been sleeping with her and her son and did not get up until 12:30 p.m. on December 4, 1996. She also testified that appellant could not have been at Gist's apartment the evening before because she and appellant had gone to bed at 8:00 p.m. and watched a movie. She heard about the robbery that night after Roxanne Torrez started screaming. She further testified that after appellant arose on December 4, 1996, he went with Joyce Boyer to go to the mall. Rashley did not believe that appellant could leave their bed without waking her up because he slept behind her. She also testified that she and appellant slept in a room in the basement and that she did not hear anyone else in the basement except for Osley who brought Rashley a birthday present around 9:00 a.m. that morning. She further testified that a police detective threatened to have her son taken away from her. She also testified that when she reported the detective's comments to his partner, the detective apologized.
Joyce Boyer, a woman who had a mother/son type of relationship with appellant and a friendship with the women who lived at the Moore Street house and worked for her, testified that on January 28 1997: Rashaana Torrez had said that she could not have seen into the kitchen from where she was sitting; Lori Sanchez said that she did not see what was going on because she sat next to Rashaana Torrez; Ruth Ann Sanchez said that she did not see anything because she had her head down the whole time; Rashaana Torrez said that she and Carter discussed killing King and that Carter and Hamilton took turns strangling King; and that the three women said they were going away to avoid testifying because they had given false statements to the police and because they were afraid of the police who had threatened them. Boyer also testified that she did not tell the police anything about this conversation. All of the three women denied ever talking to Boyer about these matters.
On December 6, 1996, the police raided the Moore Street house. At the time, Torrez was home with Lori Sanchez and Gott. When questioned by the police, Torrez did not initially tell them about what she knew or her involvement out of fear of Carter, who was not under arrest at that time. She met with the police again on December 10, 1996, and told the police part of what she knew. However, she did not tell about what she saw that involved Carter. Again on December 13, 1996, Torrez met with the police and told them about her involvement with the King murder. On January 6, 1997, she talked to the police twice. On that date, she knew that Carter was in custody and that she would be safe to implicate him. Therefore, she told the police everything she knew about the King murder. The police also questioned her for the first time about Elmore's murder, and Torrez told everything she knew about it.
Ruth Ann Sanchez testified that when she talked to the police on December 10, she stated that she needed protection, but did not get any. On January 6, 1997, she was questioned about Elmore's death. The police already knew the details, so Sanchez told what she knew.
Torrez and Ruth Ann and Lori Sanchez left Toledo on February 1, 1997, and went to Washington D.C. Ruth Ann Sanchez testified that Carter, Octavia Jones, and Gott's uncle suggested that they leave town. Torrez testified that Octavia Jones told them that they should go away to be safe. Torrez testified that Jones purchased items for Torrez and Ruth Ann and Lori Sanchez, gave them each $100 spending money and marijuana, and a bus ticket.
When Torrez and the others arrived in Washington D.C. they were met by Tone, Carter's cousin, who took them to his apartment in Sutherland, Maryland. While they were uncomfortable staying with Carter's relative, none of them tried to leave because they did not have any money or means of transportation. Nonetheless, they did travel into Washington D.C. while they were there. They stayed there thirteen days until the Maryland police picked them up and held them until Toledo police transported them back to Toledo. From that time on, the three witnesses were kept in protective custody.
Appellant was charged with aggravated murder, in violation of R.C. 2923.01(A), and conspiracy to commit aggravated murder, in violation of R.C. 2923.01(A). The elements of each of these crimes are as follows:
R.C. 2903.01(A) (Murder):
 "(A) No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy."
R.C. 2923.01(A) (Conspiracy):
 "(A) No person, with purpose to commit or to promote or facilitate the commission of aggravated murder,* * *, shall do either of the following:
 "(1) With another person or persons, plan or aid in planning the commission of any of the specified offenses;
 "(2) Agree with another person or persons that one or more of them will engage in conduct that facilitates the commission of any of the specified offenses.
 "(B) No person shall be convicted of conspiracy unless a substantial overt act in furtherance of the conspiracy is alleged and proved to have been done by the accused or a person with whom the accused conspired, subsequent to the accused's entrance into the conspiracy. For purposes of this section, an overt act is substantial when it is of a character that manifests a purpose on the part of the actor that the object of the conspiracy should be completed.
"* * *."
Upon a review of all of the evidence in this case as a whole, we find that the manifest weight of the evidence supports appellant's conviction on the charge of the aggravated murder of Elmore and conspiracy to commit aggravated murder. We cannot find any basis for concluding that the jury clearly lost its way or that a manifest miscarriage of justice occurred.
Appellant's contention that only one witness saw him holding the belt is erroneous. Both Ruth Ann and Lori Sanchez testified that they saw appellant holding a belt around Elmore's neck. Furthermore, Lewis testified that appellant was in the kitchen at the time Carter told Wortham and Lewis that one of the women would be murdered that evening.
Appellant also contends that there was no evidence that appellant's action of holding the belt around Elmore's neck was the cause of her death since Carter was also seen holding the belt. Whether Elmore died while appellant held the belt or when Carter held the belt is irrelevant. There was substantial evidence presented that appellant acted, in conjunction with Carter, to kill Elmore. State v. Smith, supra at 113-114.
Appellant also implies that the evidence indicates that he held the belt because Carter told him to do so and that Carter would have killed him if he had not done so. However, there is no evidence presented by the defense tending to prove that appellant did not voluntarily participate in the murder. In fact, Lewis testified that appellant knew earlier in the evening that Elmore was going to be killed and did not leave the premises. While a jury could have inferred that Carter ordered appellant to strangle Elmore, there is no evidence from which the jury could infer that appellant did not want to do it and that appellant complied solely because he feared Carter would kill him. Instead, the jury could only infer from the facts that appellant voluntarily associated with Carter, that appellant was present for a murder he knew would occur, and that he did strangle Elmore voluntarily.
As to King's murder, there was testimony that appellant was present in the room at the time King was murdered, that he was angry at King for committing a robbery at the Moore Street house, and that he may have held King's gun the night before.
Appellant argues that there is only evidence that he was at the scene, but inattentive, and was not actively involved with the murder. Therefore, there is no substantial evidence that he conspired to kill anyone. Instead, he argues that the evidence only proves that he was a member of a gang where the leader ordered members to kill people. We disagree. There was sufficient circumstantial evidence presented from which the jury could have inferred that appellant participated in the planning of King's murder. There was evidence that he associated with a gang whose members had committed other crimes in the past at the direction of their leader, that appellant held a position of authority within the gang, that appellant himself participated in a prior murder, that appellant was present at the time of King's murder, that he had been present at the meeting with Gist when King's involvement in the robbery was revealed, that the robbery had been planned, and that appellant was angry with King that the robbery occurred inside the Moore Street house.
Therefore, we find appellant's second assignment of error not well-taken.
In his third assignment of error, appellant argues that the trial court abused its discretion when it admitted the photographs of the dining room and kitchen of the home at 928 Page Street (Exhibits 28-31) when the photographs inaccurately depicted the murder scene because some of the furniture had been moved since that date.
Rashaana Torrez testified regarding photographs of the interior of the home where the murders occurred. She testified that with the exception that the dining room furniture was absent, the Exhibit 28 photograph accurately depicted what the dining room looked like on the dates at issue. She also testified that Exhibit 29, another photograph of the dining room, also accurately depicted the scene, except that a desk in the room had been moved. She testified that Exhibit 30, a photograph of the kitchen from the dining room accurately depicted the scene. As to Exhibit 31, another photograph of the kitchen from the doorway, she testified that it accurately depicted the scene except that the refrigerator may have been moved a little. Torrez also drew a floor plan of the Page Street home indicating the location of the furniture.
Appellant objected at trial to the admission of only Exhibits 28 29 on the basis that they were misleading since the furniture had been moved. The court noted that the jury had been informed that the furniture had been moved and, therefore, would not have been misled by the photographs. Appellant argues on appeal that he was prejudiced by the admission of the photographs. He argues that the jury could not properly weigh and determine the credibility of the testimonies of Wortham, who testified that it would have been impossible for Sanchez to see into the kitchen and see appellant holding a belt around Elmore's neck from where Sanchez sat, and Ruth Ann and Lori Sanchez, who both testified that they could see into the kitchen.
When considering the admissibility of photographic evidence under Evid.R. 403, the issue is whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice to the defendant. Resolution of this issue is left to the discretion of the trial court. Therefore, the lower court's decision will not be overturned on appeal unless the trial court abused its discretion and the defendant was materially prejudiced. State v. Hill (1967), 12 Ohio St.2d 88, paragraph two of the syllabus, and State v. Phillips (1995), 74 Ohio St.3d 72,77-78.
Properly authenticated photographs are admissible even if they do not depict the crime scene exactly as it existed at the time of the crime. See State v. Martin (Nov. 10, 1987), Hamilton App. No. C-860610, unreported (photographs of the crime scene on the same day did not depict the same traffic flow at the time of the accident). Minor changes in the scene are matters left to the jury to consider when weighing the evidence. Id. While there could be circumstances where the changes in the scene were significant enough to mislead the jury and unfairly prejudice the defendant, we do not believe that this is the case before us. While some of the furniture had been moved, the jury knew this fact and had a diagram of the home to compare to the photographs. The jury also had the testimony of Wortham that no one could have seen into the kitchen from where they were seated. We find that a reasonable jury could competently determine the issue of whether Ruth Ann and Lori Sanchez could have seen into the kitchen by determining the credibility of the witnesses and weighing the evidence.
Accordingly, we find that the trial court did not abuse its discretion by admitting these photographs into evidence. Appellant's third assignment of error is not well-taken.
Appellant argues in his fourth assignment of error that his conviction was tainted by prosecutorial misconduct. He argues that the prosecutor, during opening and closing arguments, wrongly attempted to elicit sympathy for the victims, eluded to evidence of a burglary that was kept from the jury, disparaged defense counsel, advanced the propriety of his own behavior, and indicated that prosecution witnesses told the truth and defense witnesses did not.
The test for determining whether a prosecutor's conduct constitutes reversible error requires consideration of whether the prosecutor's actions were improper and whether the defendant's substantial rights were prejudiced. State v. Lott (1990), 51 Ohio St.3d 160,165, certiorari denied (1990), 498 U.S. 1017; State v.Apanovitch (1987), 33 Ohio St.3d 19, 24; and State v. Smith
(1984), 14 Ohio St.3d 13, 14-15.
While appellant alleges that the prosecutorial misconduct occurred in both the prosecutor's opening and closing statements, he has failed to identify any misconduct in the opening statements. We have reviewed the prosecution's opening statements and find nothing that could arguably constitute misconduct.
In closing arguments, the prosecution made reference to Elmore and King. He began by noting that the jury could not let emotion, sympathy, or passion affect their verdict. Then, he stated that the jury did not get to meet the victims, who were two individual people with lives of their own who had a right to live. Despite what they had done in their life, they did not deserve to die. If they had done anything wrong, their punishment should have been through the court system, not death. He then reminded the jury that they could only decide the case based upon the evidence presented, not their emotions nor the reactions of anyone else in the courtroom.
Appellant interprets these comments as having been made to elicit sympathy for the victims. We disagree. The comments are made to counteract the possibility that the jury would find that these were not "innocent" victims because they were involved with the gang or other criminal activities. The comment was also surrounded by comments that the jury must decide the case solely based upon the law. Therefore, we conclude that this comment was not improper.
The next alleged act of misconduct was the prosecution's reference to the evidence that Osley, Shron Gaiter, Carter, and Bibbs had stolen something from the apartment of a friend of Elmore's boyfriend. The prosecutor also stated that Carter was afraid that Elmore was going to tell her boyfriend or that they would find out where the gang was located. While the specific evidence of the burglary had been excluded as hearsay, there was some reference to Carter's concern that Elmore would tell her boyfriend, who had a friend who had recently had something stolen from his apartment, about the gang's whereabouts. Appellant also referred to the burglary in his closing arguments to support his defense that he had no purpose for killing Elmore, and that the whole thing was the work of Carter.
As to this comment, we agree that the prosecutor went slightly beyond the matters in evidence when he listed the persons involved in the burglary, which would be improper under DR 7-106(C) (1). However, in light of the facts that there was some testimony regarding the burglary and appellant also made the same type of comment to bolster his defense, we find that the prosecution's reference to the people involved in the burglary was not improper in this case.
Appellant next argues that the prosecutor made disparaging comments about defense counsel and then advanced the propriety of the prosecutor's own behavior. He cites to a portion of the closing argument where the prosecutor referred to appellant's and Bibbs' defense that they did not know the Elmore killing was planned as the "Tweedle-Dee and Tweedle-Dum" defense. When defense counsel objected to the statement and it was overruled, the prosecutor continued by stating that the defense could object, but the jury only needed to look at the facts.
While the prosecution is free to characterize the defense's position, it was improper for the prosecution to make comments about the defense's objection. State v. Keenan (1993),66 Ohio St.3d 402, 406, certiorari denied (1998), 142 L.Ed.2d 119,119 S.Ct. 146.
Appellant then cites to a later portion of the prosecutor's closing argument where the prosecutor stated that the closing arguments for both defense lawyers was long, so long that the prosecutor could not respond to every point, and that the testimonies of their witnesses appear to be rehearsed, which he also indicated would be "professionally deplorable" to him.
While there is some double meaning to the language the prosecution employed in the first comment, which can only be understood by those who were present at trial and able to hear the inflection placed on the words, we do not find that this first comment could have been so disparaging that it rises to the level of prosecutorial misconduct. Some latitude must be allowed during closing arguments for statements made in the heat of the moment.State v. Rahmen (1986), 23 Ohio St.3d 146, 154. Nonetheless, we find that the second comment was improper. The prosecution argues on appeal that this statement was made in response to the defense counsel's argument that the prosecution's witnesses appeared to have rehearsed their testimony, and it was, therefore, invited error. We disagree. The state could have responded to the contention without making an improper statement itself.
Finally, appellant argues that the prosecutor should not have made comments indicating that the defense witnesses lied while the prosecution's witnesses told the truth. The prosecution evaluated the testimony of Torrez and the Sanchez sisters, pointing out that their statements to the police proceeded in a progressive disclosure of more and more information that implicated themselves. He compared that with Wortham's testimony, which was either inconsistent with his prior statements that revealed more information or was contrary to his prior statements. The prosecution implied that Wortham's testimony was not credible because it was not consistent with his prior statements. Appellant likewise pointed to the inconsistencies in the testimonies of the witnesses and explained to the jury why the testimonies of Torrez and the Sanchez sisters were not believable. He went on to state outright that all three were lying.
We find that the prosecutor's comments analyzing the testimonies of the witness regarding their credibility was not improper. The prosecutor did not state that any witness lied, but made a fair comment on the evidence that was presented.
Therefore, we conclude that there were at most two incidents where the prosecution made inappropriate comments about the defense's objection and an accusation that the defense witnesses appeared to have rehearsed their testimony. In light of the amount of evidence presented in this case supporting the guilty verdict, we find that these acts of prosecutorial misconduct could not have affected the outcome of this trial nor prevented appellant from having a fair trial. Therefore, appellant's fourth assignment of error is not well-taken.
In his fifth assignment of error, appellant argues that he was denied ineffective assistance of counsel if any of the errors alleged above were not preserved for appeal. Having found that none of the errors alleged above have merit, we find this assignment of error moot.
Having found that the trial court did not commit error prejudicial to appellant, the judgment of the Lucas County Court of Common Pleas is affirmed. Pursuant to App.R. 24, appellant is hereby ordered to pay the court costs incurred on appeal.
Peter M. Handwork, P.J.
 Melvin L. Resnick, J.
 Mark L. Pietrykowski, J.
CONCUR.
 _______________________________ JUDGE