OPINION
Defendant-appellant, Douglas Farwell, appeals his conviction in the Clermont County Court of Common Pleas for grand theft.
Appellant was indicted on September 22, 1999 on one count of grand theft in violation of R.C. 2913.02(A)(2), and one count of misuse of credit cards in violation of R.C. 2913.21(B)(2), both fourth-degree felonies. A jury trial held on September 25-28, 2000 revealed the following facts:
Michael Jamgochian is an engineer in Maryland who in the fall of 1998 was looking to sell a weight-loss company he owned on the side, Body Beautiful, Inc. Body Beautiful had two offices, one in Maryland and one in Virginia. Appellant, who then owned a cosmetic laser skin-care business, CosMedic Laser Center ("CosMedic"),[1] located at 1010 Ohio Pike in Cincinnati, Ohio, was interested in buying Jamgochian's company. The two men entered into an asset purchase agreement on October 5, 1998. The agreement provided in relevant part that
 This Asset Purchase Agreement * * * is made * * * by and between NuRx, Inc., Body Beautiful, Inc., and Michael Jamgochian (herein collectively referred to as "Seller"), and a Delaware corporation to be formed by Douglas J. Farwell, Trustee of the Brindle Trust, for the purpose of this asset purchase, on the other hand ("Purchaser"). Until such corporation is formed, Douglas J. Farwell, Trustee, shall act on behalf of the Purchaser in all respects.
* * *
ARTICLE 2
PURCHASE PRICE
 2.1 Amount of Purchase Price. The aggregate purchase price for all the Assets shall nominally be * * * $100,000.00 ("the Purchase Price"), but which sum shall not be payable in cash or other property but shall be paid in accordance with Section 2.2 hereof.
 2.2 Payment of Purchase Price. The Purchase Price will be paid by the Purchaser to Seller in the form of services, obtaining sales for the ongoing business of Purchaser, arranging the purchase of equipment or the obtaining of credit (other than the credit line referred to in Section 15.12 hereof to be obtained by Michael Jamgochian) all of which may or may not benefit Seller's shareholder, Michael Jamgochian, and by the transfer of forty five (45%) percent of the issued and outstanding shares of Purchaser * * * to Michael Jamgochian.
* * *
ARTICLE 15
MISCELLANEOUS
* * *
15.12 Transition and Transition Assistance.
* * *
 (c) * * * Michael Jamgochian will obtain a credit line for Purchaser of $100,000.00 to be used for the purchase of equipment and/or working capital at or prior to the Closing. Purchaser agrees to promptly repay any use of this credit line plus any interest that Michael Jamgochian is paying prior to disbursement of any profits.
 Following the asset purchase agreement, Jamgochian retained a forty-five percent ownership as a shareholder in the new Body Beautiful company (the "Company") while appellant became a majority shareholder with a fifty-five percent ownership in the Company. Appellant was appointed as the Company's president and secretary while Jamgochian was appointed as vice-president and treasurer. Jamgochian thereafter obtained a home equity line of credit for $100,000.
In October 1998, appellant told Jamgochian they needed to buy two Power Peel machines (micro-dermabrasion devices), one for the Maryland office and one for the Virginia office. Although the company distributing the machines, Aesthetic Lasers Inc. ("ALI"), was close to Jamgochian's residence, appellant forbade him to contact ALI and told him that he (appellant) would be the only one dealing with ALI. The record shows that prior to October 1998, appellant was a good customer of ALI and already owned a Power Peel machine (it was used at CosMedic). The record also shows that in February 1998, ALI and appellant entered into a contract for appellant to be a sales representative. Appellant's territory did not include Maryland. The contract was, however, terminated a month later.
Appellant told Jamgochian that each machine cost $18,500 and that they could not be paid with a "company check." Rather, appellant insisted that the machines be paid with two $18,500 cashier's checks. Jamgochian borrowed $37,000 from the $100,000 home equity line of credit and gave appellant two $18,500 cashier's checks, payable to ALI, and dated October 27, 1998. ALI cashed both checks and on October 29, 1998, sent two invoices for the machines to the Medical Center for Cosmetic Excellence (the "Medical Center"), care of appellant, at 1010 Ohio Pike. That same day, appellant went to ALI's office, picked up one of the two machines, and received from ALI a $16,000 check, payable to CosMedic, care of appellant. Pat Dejacma, ALI's vice-president, explained that the $16,000 was the equivalent of an $8,000 sales commission for each of the two machines ordered and paid for by appellant. Dejacma explained that appellant received a sales commission because he was a good customer and used to be a sales representative. The machine picked up by appellant was used in the Maryland office.
The second machine was never delivered to appellant or the Company. In mid-November, upon discovering that the first machine was being used in Maryland in violation of appellant's February 1998 contract with ALI,[2]
ALI notified appellant that it would not sell him the second machine as follows:
 I find it impossible to obtain another demo to fill your order for a third Power Peel microdermabraison unit. Enclosed please find a check in the amount of $10,500 for full reimbursement of purchase price for the third unit you wished to purchase.[3]
Dejacma admitted that the notification did not state the real reason for not delivering the second machine. The $10,500 check represented the $18,500 price of the second machine minus the $8,000 sales commission (for the second machine) which had been improvidently given to appellant. The check was payable and sent to the Medical Center, in care of appellant, at 1010 Ohio Pike. Dejacma testified that the check was made out to the center because she believed that is where the cashier's checks came from. Indeed, appellant never told ALI that the money used to purchase the machines came from someone other than himself.
Dejacma also testified that both the $16,000 sales commission check and the $10,500 refund check were not made out to appellant personally, but rather were sent to 1010 Ohio Pike and payable to either CosMedic or the Medical Center. The record shows, however, that appellant was the owner of CosMedic, that CosMedic and the Medical Center shared the same address in Cincinnati, and that Jamgochian had no ownership interest in either CosMedic or the Medical Center.
Appellant never told Jamgochian about the $16,000 sales commission or the $10,500 refund for the second machine. Instead, appellant told Jamgochian that the second machine was on back order. The record shows that appellant told the same lie to two employees for several months. Between October 1998 and March 1999, Jamgochian repeatedly asked appellant for copies of the machines' invoices but his requests were ignored. In April 1999, Jamgochian decided to contact ALI himself about the second machine. He then discovered that the second machine had never been on back order and that appellant had received $26,500 back from ALI. Jamgochian testified that appellant never told him what he had done with the $26,500.
The jury trial also revealed the following conflicting testimonies: on direct examination, Jamgochian testified that he borrowed $37,000 from the $100,000 home equity line of credit to pay for the cashier's checks for the machines. Yet, on cross-examination, Jamgochian denied that the $37,000 was part of the $100,000 home equity line of credit. Jamgochian admitted that he did not have a separate agreement covering the $37,000 and providing that it was a personal loan between appellant and him.
Jamgochian also testified on cross-examination that the $37,000 was given to appellant in his individual capacity and not in his capacity as the Company's president. Yet, Jamgochian denied that the $37,000 was a personal loan. The record shows that an amount of $37,000 was reported to the Internal Revenue Service as a loan from Jamgochian to the Company, which is incorporated as an S corporation.
ALI's letter to appellant notifying him that it would not sell him the second machine states that "I find it impossible to obtain another demo to fill your order for a third Power Peel[.]" Dejacma testified that in order to receive his sales commission, appellant had agreed to accept "demo equipment." Dejacma testified that when appellant came to pick up the first machine, they only had brand new machines and no "demo" in stock. Although she did not know if the machine picked up by appellant was brand new or a "demo," Dejacma testified they would not sell a "demo" for $18,500.
At the close of the state's case, and again at the close of all the evidence, appellant orally moved for acquittal. The trial court overruled both motions. On September 29, 2000, a jury acquitted appellant of the misuse of credit cards charge but found him guilty of grand theft in violation of R.C. 2913.02(A)(2). Appellant was sentenced to five years of community control. On October 13, 2000, appellant filed a motion for acquittal pursuant to Crim.R. 29(C) as well as a motion for a new trial. Following a hearing on both motions on December 21, 2000, the trial court overruled both motions. This appeal follows in which appellant raises four assignments of error.
Assignment of Error No. 1:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT IN OVERRULING HIS MOTION FOR DIRECTED VERDICT AND RULE 29 MOTION AS INSUFFICIENT EVIDENCE EXISTED TO CONVICT APPELLANT.
Crim.R. 29(C) allows a trial court, upon motion, to set aside a guilty verdict and enter a judgment of acquittal. The trial court applies the same standard in ruling on motions for acquittal presented either at trial or made after judgment. State v. Miley (1996), 114 Ohio App.3d 738,742. Therefore, a trial court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt. State v. Bridgeman (1978),55 Ohio St.2d 261, syllabus.
When reviewing a claim of insufficient evidence, an appellate court shall
 examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. Further, upon appellate review, the reviewing court may not substitute its judgment for the trier of fact on issues as to the credibility of witness testimony. State v. Walker (1978), 55 Ohio St.2d 208, 212, certiorari denied (1979), 441 U.S. 924, 99 S.Ct. 2033.
Appellant argues that there was insufficient evidence to support his conviction for theft under R.C. 2913.02. Appellant asserts that as a fifty-five percent owner pursuant to the asset purchase agreement, "[i]t is legally impossible for [him] to be convicted of theft of property for which he had an ownership interest," and cites State v. King (1983),10 Ohio App.3d 93 in support.[4]
We find that King is factually different from the case at bar and that, therefore, its holding does not apply here. In King, James Eberle was the sole stockholder of his company, which was engaged in the business of buying and selling used cars. Eberle's company was financed with a line of credit with Toledo Trust Company. Eberle and the defendant entered into a business arrangement whereby they would buy cars and send them to an auction company to sell them. The defendant was authorized to sign drafts on the line of credit and was to deposit checks into the Toledo Trust Company account when cars sold through the auction company. The defendant started his own company, purchased a Corvette under Eberle's company's name, retitled the Corvette under his own company's name, and then sold the car to himself through his company for $10,000.
The defendant was charged with theft in violation of R.C. 2913.02(A)(2) and (4) and was found guilty after a jury trial. The trial court refused to instruct the jury that a partner cannot be criminally liable for theft of partnership property because he is a co-owner of it. On appeal, the defendant argued that the challenged transactions were on behalf of a partnership, that he and Eberle were partners, and that as a result, he could not be held criminally liable for the transactions. The Tenth Appellate District noted that "even assuming that there may be theft of partnership property by a partner, the owner would be the partnership, not the individual partners, and the intent must be to deprive the partnership rather than the partners of the use of the property." King,10 Ohio App.3d at 95. The appellate court reversed and remanded the defendant's theft conviction on the ground that "[t]he trial court should have given an instruction with respect to partnership as requested by defendant since the evidence was more than sufficient to permit a finding that a partnership existed." Id. at 96.
Upon reviewing the record, we find that the evidence does not establish the existence of a partnership agreement between Jamgochian and appellant, and that as a result, the analysis and holding in King do not apply here. A partnership is "an association of two or more persons to carry on as co-owners a business for profit." R.C. 1775.05(A). While no single fact or circumstance operates as a conclusive test for the existence of a partnership, R.C. 1775.06 sets forth guidelines for determining the existence of a partnership. Participation in the profits of a business, though cogent evidence of a partnership, is not necessarily dispositive of the question. Berger v. Dare (1994),99 Ohio App.3d 103, 106.
In the case at bar, there is no written partnership agreement, and no evidence of an oral partnership agreement between Jamgochian and appellant. There is no evidence that the parties intended to operate the Company as a partnership. The only reference to profit sharing in the record comes from the asset purchase agreement which provides that appellant agrees to promptly repay any use of the $100,000 line of credit plus any interest paid by Jamgochian prior to disbursement of profits. There is no evidence that the parties ever filed a partnership tax return or paid taxes as a partnership. Instead, the record shows that the Company is incorporated as an S corporation for which an income tax return was filed for 1998. The record also shows that both parties are shareholders and officers of the Company. In light of all of the foregoing, we find that the evidence does not establish the existence of a partnership between Jamgochian and appellant.
 Absent a partnership, we also find that appellant's argument that, as a fifty-five percent owner of the Company, it is legally impossible for him to be convicted of theft of property for which he had an ownership interest, does not apply to corporations. Such argument denies the existence of the corporation as a separate legal entity. It is well-established that a corporation is a separate legal entity from its shareholders, even where there is only one shareholder. LeRoux's Billyle Supper Club v. Ma (1991), 77 Ohio App.3d 417, 420. There is a vast distinction between the owner of fifty-five percent of a corporations' capital stock and the owner of a fifty-five percent interest in a partnership. See Laine v. Commonwealth (Ky.App. 1941), 287 Ky. 134, 151 S.W.2d 1055.
Appellant was charged with violating R.C. 2913.02(A)(2) which provides that "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * [b]eyond the scope of the express or implied consent of the owner or person authorized to give consent[.]" Owner "means, unless the context requires a different meaning, any person, other than the actor, who is the owner of, who has possession or control of, or who has any license or interest in property or services * * *." R.C. 2913.01(D).
"Once a person lawfully has control over property with consent, that person cannot thereafter exert control for a different purpose. That person already has control. * * * If the individual begins to use the property for something outside what the owner specifically authorized, the individual has gone beyond the owner's consent." State v. Dortch (Oct. 15, 1999), Montgomery App. No. 17700, 1999 Ohio App. LEXIS 4838, at *10, unreported. Deprivation of property includes withholding property permanently or for a period that appropriates a substantial portion of its value or use, and disposing of property so as to make it unlikely that the owner will recover it. R.C. 2913.01(C)(1), (2). Evidence of a defendant's conduct may be used to establish intent to commit theft. SeeState v. Hammerschmidt (Mar. 8, 2000), Medina App. No. 2987-M, unreported.
The parties' asset purchase agreement clearly required Jamgochian to obtain a $100,000 line of credit for appellant to be used for the purchase of equipment and/or working capital. Jamgochian obtained a $100,000 line of credit. In October 1998, appellant told Jamgochian that they needed to buy two machines and that each machine cost $18,500. Appellant also told Jamgochian that the machines could not be paid with a "company check" and instead, insisted that they be paid with two $18,500 cashier's checks. Jamgochian used $37,000 from the $100,000 line of credit to pay for the two $18,500 cashier's checks which he gave appellant. The record clearly shows that the two cashier's checks were for the specific purpose of buying those two machines. ALI cashed both checks and sent the invoices for the two machines to the Medical Center, care of appellant.
Although ALI, the machines' distributor, was close to Jamgochian's residence in Maryland, appellant forbade Jamgochian to contact ALI and told him that he (appellant) would be the only one dealing with ALI. Indeed, on October 29, 1998, and even though his own business, CosMedic, was located in Cincinnati, Ohio, appellant traveled to Maryland to pick up one of the two machines. At ALI's office, appellant received a $16,000 check payable to CosMedic, care of appellant. The second machine was never delivered to appellant or the Company. In mid-November, ALI notified appellant that it would not sell him the second machine. Along with the notification was a $10,500 check representing the $18,500 price of the second machine minus the $8,000 sales commission (for the second machine) which had been improvidently given to appellant. The check was payable and sent to the Medical Center, care of appellant. ALI's vice-president testified that the $10,500 check was made out to the center because she believed that is where the cashier's checks came from. Indeed, appellant never told ALI that the money used to purchase the machines came from someone other than himself. The record shows that appellant was the owner of CosMedic, that CosMedic and the Medical Center shared the same address in Cincinnati, and that Jamgochian had no ownership interest in either CosMedic or the Medical Center.
Appellant never told Jamgochian about the $16,000 sales commission or the $10,500 refund for the second machine. Instead, appellant told Jamgochian that the second machine was on back order. The record shows that appellant told the same lie to two employees for several months. Between October 1998 and March 1999, Jamgochian repeatedly asked appellant for copies of the machines' invoices but his requests were ignored. In April 1999, Jamgochian decided to contact ALI himself about the second machine. He then discovered that the second machine had never been on back order and that appellant had received $26,500 back from ALI. Jamgochian testified that appellant never told him what he had done with the $26,500. There is no evidence that appellant used any or all of the $26,500 given back to him by ALI for the purchase of equipment and/or working capital.
All of the foregoing shows that appellant clearly exerted control over $26,500 beyond the scope of Jamgochian's express or implied consent. Appellant exerted control over $18,500 beyond the scope of Jamgochian's express consent because appellant was to use the money to buy a second machine, the second machine was never delivered, yet appellant claimed for several months that it was on back order. Although the $18,500 was never used to buy the second machine, appellant did not return it to Jamgochian. There is no evidence that he used it to purchase other equipment and/or for working capital. Appellant also exerted control over $8,000 beyond the scope of Jamgochian's consent because although the machine that was delivered ended up not costing $18,500 as appellant had told Jamgochian, appellant never returned the money to Jamgochian. There is no evidence that he used the money to purchase other equipment and/or for working capital.
Therefore, in accordance with the standard of review articulated above, we find that appellant's conviction for theft under R.C.2913.02(A)(2) was supported by sufficient evidence. Appellant's first assignment of error is overruled.
Assignment of Error No. 2:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT IN OVERRULING HIS MOTION FOR A NEW TRIAL BY IMPROPERLY INSTRUCTING THE JURY.
Appellant argues that the trial court's failure to instruct the jury on corporate ownership and the ownership of the machines amounted to a prejudicial and reversible error. Appellant asserts that the jury should have been instructed (1) to make a finding as to whether appellant had an ownership interest in the machines, and (2) that it is legally impossible to steal property from oneself. Instead, the court "merely instructed the jury * * * to assume Appellant is not the owner."
Appellant has failed to provide us with a transcript of the trial court's instructions to the jury.[5] The duty to provide a transcript for appellate review fall upon the appellant because an appellant bears the burden of showing error by reference to the matters in the record.Columbus v. Hodge (1987), 37 Ohio App.3d 68. A meaningful review of a trial court's decision must be based on the record before us, not mere conclusory assertions in an appellate brief. Wilhoite v. Kast (Dec. 31, 2001), Warren App. No. CA2001-01-001, unreported, at 18. When portions of the transcript necessary for resolution of assigned errors are omitted from the record, a reviewing court has nothing to pass upon and, as a result, must presume the validity of the lower court's proceedings and affirm. Hodge at 68, citing Knapp v. Edwards Laboratories (1980),61 Ohio St.2d 197. Appellant's second assignment of error is accordingly overruled.
Assignment of Error No. 3:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT IN OVERRULING HIS MOTION FOR NEW TRIAL FOR PROSECUTORIAL MISCONDUCT.
Appellant argues that the prosecutor engaged in misconduct during the rebuttal portion of his closing argument by referring to appellant's failure to testify and by repeatedly calling appellant "a liar and dishonest." Specifically, appellant challenges the prosecutor's following statements:
 And I think that's the reason you did not hear one word from the Defense, Ladies and Gentlemen, about [appellant's] deception. Not a word. Because that is the crux of the case. [Appellant's] conduct from October 29th, specifically, through November 13th and, then, afterwards, when he doesn't provide any information, refuses to provide any documentation and, deceptively, lies to Sharon Eubanks [a CosMedic's employee]
 MR. FERENC [appellant's trial counsel]: May we approach?
 THE COURT: Yes.
(Discussion off the record.)
 THE COURT: In terms of closing argument, Counsel will argue their positions. * * * and it's the Court's call as to whether a particular instance the argument has gone beyond the bounds of what can be allowed, and whether or not it appeals to the passion of the jury. And, of course, [the prosecutor's] last statement, in terms of calling [appellant] a liar crosses the bounds and in that regard, you're instructed to disregard that statement. * * *
 MR. BROCK [the prosecutor]: Thank you, Judge. Ladies and Gentlemen, [appellant's] dishonesty to Mr. Jamgochian, to Ms. Eubanks and to Mr. Mifsa [who used to work for appellant], clearly, supports the inference that he was hiding the nuts and bolts of this transaction. And why? Because he was pocketing the money. He was keeping the money for his own personal use. I have made the argument, Ladies and Gentlemen, the evidence is that [appellant], clearly, kept ALI and Mike Jamgochian, the money man, apart.
* * *
 He was dishonest to the three individuals that we talked about, in terms of the status of this machine, and ask yourself any legitimate, logical explanation why he would be dishonest about that if, in fact, he hadn't stolen the money.
A new trial may be granted for prosecutorial misconduct. Crim.R. 33(A)(2). The granting or denial of a motion for a new trial pursuant to Crim.R. 33 is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. State v. Saunders
(1994), 98 Ohio App.3d 355, 358.
The test for prosecutorial misconduct is whether the remarks made by the prosecution were improper and, if so, whether they prejudicially affected substantial rights of the accused. State v. Smith (1984),14 Ohio St.3d 13, 14. Even if a prosecutor's statements during closing arguments are improper, reversal based upon those statements is warranted "only if [they] permeate the entire atmosphere of the trial." Statev. Tumbleson (1995), 105 Ohio App.3d 693, 699. When reviewing the record, it must be remembered that both the defense and prosecution are given wide latitude in their arguments "as to what the evidence has shown and what reasonable inferences may be drawn therefrom." Id. In examining the prosecutor's arguments for possible misconduct, we must review the argument as a whole, not in isolated parts, and we must examine the argument in relation to that of opposing counsel. State v.Kroger (Apr. 3, 2000), Clermont App. No. CA99-05-050, unreported, at 6.
Appellant first argues that the prosecutor engaged in misconduct during the rebuttal portion of his closing argument by referring to appellant's failure to testify.
A prosecutor's comments regarding a defendant's refusal or failure to testify violates the defendant's Fifth Amendment right to remain silent.State v. Thompson (1987), 33 Ohio St.3d 1, 4; see, also, Griffin v.California (1965), 380 U.S. 609, 85 S.Ct. 1229. Federal courts have divided improper-comment cases into two categories:
 The first category involves cases in which the prosecutor or court commented directly and adversely on the defendant's failure to testify. In the second category of cases the alleged infringement consists of statements which refer, if at all, only obliquely to the defendant's decision not to take the stand. The federal courts have developed, and the Ohio Supreme Court has recognized as "helpful," a two-prong analysis to be applied to the second category of cases to determine whether a comment is improper: "Whether the language used was manifestly intended to be or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." Butler v. Rose (C.A.6, 1982), 686 F.2d 1163.
State v. Clark (1991), 74 Ohio App.3d 151, 156-157.
Upon thoroughly reviewing the closing argument of both the defense and the prosecution as a whole, we find that the prosecutor's comment was not manifestly intended to be a comment on appellant's failure to testify. Rather, the prosecutor's comment was an attempt to rebut defense counsel's inference that the $26,500 received by appellant from ALI could have been used for corporate purposes, such as paying the salaries of CosMedic's employees who scheduled appointments for the Maryland and Virginia offices, rather than being pocketed by appellant. Indeed, the challenged prosecutorial comment was preceded by other comments by the prosecutor such as "If it was a legitimate use and it was put back in for the benefit of the company, he would have told Mr. Jamgochian of that[,]" and "Given [appellant's] failure to provide any explanation, for over five months, concerning where this property went, * * * is it logical for you to conclude that, in fact, this money went back into the business? I submit to you that is not." The prosecutor's comment therefore did not rise to a reversible error.
Appellant also argues that the prosecutor engaged in misconduct by repeatedly calling him "a liar and dishonest."
Prosecutors must avoid insinuations and assertions calculated to mislead the jury and refrain from expressing a personal opinion as to the credibility or guilt of the accused. Smith, 14 Ohio St.3d at 14. It is improper for a prosecutor to state that the defendant is a liar or that he believes the defendant is lying. State v. Rahman (1986),23 Ohio St.3d 146, 154. However, a prosecutor may comment upon the testimony and suggest the conclusions to be drawn therefrom is that "the defendant is lying, is scheming, [or] has ulterior motives, including his own hide, for not telling the truth." State v. Draughn (1992),76 Ohio App.3d 664, 670.
In the case at bar, the prosecutor first commented on the fact that appellant had "refuse[d] to provide any documentation and, deceptively, lie[d] to Sharon Eubanks." Appellant's trial counsel asked to approach the bench. Thereafter, the trial court instructed the jury to disregard the prosecutor's statement calling appellant a liar. The trial court also reminded the jury that "ultimately, the assessment of the credibility of this witness is for you to make. And, as I have instructed you in the beginning, arguments of Counsel are not evidence." It is well-established that a jury is presumed to follow any curative instructions given by the trial court. State v. Henderson (1988),39 Ohio St.3d 24, 33, certiorari denied (1989), 489 U.S. 1072,109 S.Ct. 1357. There is no evidence in the record that the jury did not follow the trial court's curative instruction. Accordingly, we find that while improper, the foregoing comment did not permeate the entire atmosphere of the trial, and therefore did not amount to a reversible error.Tumbleson, 105 Ohio App.3d at 699.
Next, appellant challenges two other prosecutorial statements, to wit: "[appellant's] dishonesty * * * clearly supports the inference that he was hiding the nuts and bolts of this transaction[,]" and "[appellant] was dishonest * * * in terms of the status of this machine, and ask yourself any legitimate, logical explanation why he would be dishonest about that if, in fact he hadn't stolen the money." Appellant did not object to those comments, thus waiving all but plain error under Crim.R. 52(B). Plain error does not exist unless, but for the error, the outcome of the trial would have been different. Jenks, 61 Ohio St.3d at 282. Notice of plain error is to be taken in exceptional circumstances and only to prevent a manifest miscarriage of justice. Id. In addition, a prosecutor's latitude in closing argument is wider on rebuttal where the prosecutor has room to respond to closing arguments of defense counsel.State v. Houseman (June 29, 2000), Belmont App. No. 98 BA 4, 2000 Ohio App. LEXIS 3015, at *7, unreported.
Upon thoroughly reviewing the rebuttal portion of the prosecutor's closing argument as a whole, we find that the foregoing comments did not amount to plain error. It is undisputed that for several months appellant told Jamgochian and two employees that the second machine was on back order when in fact it was not. The record shows that ALI notified appellant two weeks after he placed the order that the second machine would not be delivered. In addition, the offenses with which appellant was charged involved deception. Characterizing appellant as being dishonest was marginally permissible and not so prejudicial that appellant's trial was unfair. Id. at *8, citing State v. Clemons (1998),82 Ohio St.3d 438, certiorari denied (1999), 527 U.S. 1077, 119 S.Ct. 816
(characterizing borderline comments as being "marginally permissible" after consideration of the context and the evidence).
Although we find that all of the challenged prosecutorial comments did not constitute reversible error, we want to emphasize that prosecutors must be diligent in their efforts to stay within the boundaries of acceptable argument. Prosecutors serve a special role in our justice system requiring them to adhere to the highest standards. A prosecutor "may prosecute with earnestness and vigor * * *. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." Berger v. United States (1935), 295 U.S. 78, 88,55 S.Ct. 629, 633.
Assignment of Error No. 4:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT IN OVERRULING HIS MOTION FOR NEW TRIAL BASED ON INEFFECTIVE ASISTANCE OF COUNSEL.
To establish a claim of ineffective assistance of counsel, a defendant must show that his counsel's actions were outside the wide range of professionally competent assistance, and that he was prejudiced by reason of counsel's actions. Strickland v. Washington (1984), 466 U.S. 668,687, 104 S.Ct. 2052, 2064. Trial counsel's performance will not be deemed ineffective unless the defendant shows that "counsel's representation fell below an objective standard of reasonableness," id. at 688,104 S.Ct. at 2064, and that "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." State v. Bradley (1989), 42 Ohio St.3d 136, 143, certiorari denied (1990), 497 U.S. 1011, 110 S.Ct. 3258. The defendant bears the burden of demonstrating ineffective assistance of counsel. State v.Hamblin (1988), 37 Ohio St.3d 153, 156, certiorari denied, 488 U.S. 975,109 S.Ct. 515.
In addition, any questions regarding the effectiveness of counsel must be viewed in light of the evidence against the defendant, Bradley at 142, with a "strong presumption that counsel's conduct falls within the wide range of professional assistance." Strickland at 689,104 S.Ct. at 2065. It is not the role of the appellate court to second-guess the strategic decisions of trial counsel. State v. Carter (1995),72 Ohio St.3d 545, 558, certiorari denied, 516 U.S. 1014, 116 S.Ct. 575. Hindsight may not be used to distort the assessment of what was reasonable in light of trial counsel's perspective at the time. State v.Cook (1992), 65 Ohio St.3d 516, 524-525, certiorari denied (1994),510 U.S. 1040, 114 S.Ct. 681.
Appellant first argues his trial counsel was ineffective because he failed to object to the trial court's jury instruction that appellant was not the owner of the machines. As previously noted, appellant has failed to provide us with a transcript of the trial court's instructions to the jury. As a result, we have no way of knowing what jury instructions were given and what trial counsel did. This claim of ineffective assistance is therefore without merit.
Next, appellant argues his trial counsel was ineffective because the only witness who testified for the defense was the most damaging witness to appellant. The witness testified that he would be shocked to learn that appellant had received a refund from ALI. The witness also testified that he was aware that appellant repeatedly stated that the second machine was on back order. The testimony was elicited by the state on cross-examination. With regard to the status of the second machine, the record shows that such testimony was merely cumulative to the testimony of Jamgochian and an employee of CosMedic testifying on behalf of the state. With regard to the witness' testimony about the refund, we do not believe that "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different."Bradley (1989), 42 Ohio St.3d at 143. This claim of ineffective assistance of counsel is therefore without merit.
Next, appellant argues his trial counsel was ineffective because he failed to present clear evidence that "the second machine valued at $18,500 * * * was taken by [appellant] out of the corporation." In support of his argument, appellant attached to his brief an affidavit from Jamgochian, dated October 1999, and apparently filed in the Circuit Court for Prince George's County, Maryland, as well as a complaint filed in the same Maryland court by Jamgochian and Body Beautiful, Inc. against appellant and CosMedic.
Appellant also asserts that
 [Trial counsel] refused to have appellant testify, continually told appellant that the State could not prove their case, never went over some 86 pieces of evidence and offers of proof provided by [appellant], never presented any of the evidence provided at trial, other than one witness which hurt his client, never interviewed any witnesses, despite repeated requests by [appellant] to do so, never gave any consideration for all of the information provided by appellant.
In support of his argument, appellant attached to his motion for a new trial an affidavit signed by him and dated November 2000.
We note that appellant's affidavit was never filed in the trial court. Appellant's foregoing two arguments are based upon matters that are outside the record on appeal. In determining a claim of ineffective assistance of counsel, our review is limited to the record before this court. It is impossible for a reviewing court to determine on direct appeal whether ineffective assistance of counsel occurred where the allegations of ineffectiveness are based upon evidence outside of the record. State v. Cooperrider (1983), 4 Ohio St.3d 226, 228. The foregoing two claims of ineffective assistance of counsel are therefore without merit.
Finally, appellant argues his trial counsel was ineffective because the witness testifying for the defense offered no testimony and/or real evidence as to whether appellant was the owner of the machine or as to whether the $26,000 he received from ALI was used for a business purpose. Appellant is essentially arguing that trial counsel improperly focused on the argument that the state did not have a case against appellant rather than focusing on an ownership defense, that is, that as a business partner, appellant could not steal from himself, and that the machine and the $26,000 were corporate assets and used for corporate purposes.
Following a hearing on appellant's motion for a new trial, the trial court found, inter alia, that
 Ownership, personal use. I do not agree, I think what the Defense is arguing is that [trial counsel] was oblivious to the fact that ownership was an issue. I don't think that that's correct at all. I think we're talking about two sides of the coin but we're talking about the same coin. [Trial counsel] argued throughout the case that, "Look this money didn't go to [appellant], this was a business. This went into the business. This was look at the documents in this case."
 While he did not choose to argue it in the same manner that you would argue it, it seems to me that his argument was going to the same issue which is that [appellant] was an owner was a corporate officer. This money went into the corporation. [Appellant] had the right to do with it as he chose to do, as an officer of the corporation, and therefore, folks, he didn't obtain any property or services. I think the argument that was made that you are suggesting that [trial counsel] did not make, was actually made.
The record supports the trial court's findings.
Appellant's argument clearly calls into question defense counsel's trial tactics. A thorough review of the record shows that trial counsel's strategy was to seek a total acquittal for his client. While hindsight obviously reveals that this strategy was ineffective with regard to the grand theft charge, "we adhere to the principle established and followed by the Ohio Supreme Court that when trial counsel chooses a strategy which later proves to be ineffective, the fact that another or better strategy was available does not amount to a breach of an essential duty to his client." State v. Carter (1996), 115 Ohio App.3d 770, 777, citing State v. Clayton (1980), 62 Ohio St.2d 45, certiorari denied,449 U.S. 879, 101 S.Ct. 227.
In light of all of the foregoing, we find that although appellant takes issue with many of his trial counsel's choices and strategies during trial, appellant did not receive ineffective assistance of counsel at trial. Appellant's fourth assignment of error is overruled.
Judgment affirmed.
POWELL, P.J., and YOUNG, J., concur.
[1] In his reply brief, appellant asserts that he merely operated and managed CosMedic, and that a Jim Carsons, and not appellant, owned CosMedic. The record is devoid of any evidence about Jim Carsons. Two witnesses testified that appellant owned CosMedic. There is no contrary evidence in the record.
[2] Dejacma testified that the machines were sold to appellant with the understanding they would be used in Ohio. Dejacma explained that ALI's sales representatives had protected territories and that therefore, any transaction involving the use of their machines in Maryland was to be handled by the Maryland sales representative. As already noted, appellant's territory did not include Maryland.
[3] Because appellant already owned a Power Peel machine which he was using at CosMedic, this would have been his third such machine. It was, however, the second machine for the Company.
[4] We note that we have reviewed the other cases cited by appellant under this assignment of error. We find, however, that the cases cited by appellant are factually different or distinguishable, and that, as a result, their reasoning and holding do not apply to the case at bar. That is particularly true of this court's opinion in Fairfield v. Sims
(Dec. 21, 1998), Butler App. No. CA97-12-247, unreported, where we held that the owner of ladders could not be convicted of theft under R.C.2913.02(A)(1) because it is legally impossible for one to steal from oneself. There was no issue of partnership and/or corporation in Sims. In addition, the defendant in Sims was charged with violating R.C.2913.02(A)(1) (theft of property without the consent of the property's owner), not R.C. 2913.02(A)(2) (theft of property beyond the scope of the express or implied consent of the property's owner).
[5] We note that there are four loose pages of jury instructions in the appellate file, apparently photocopied from the Ohio Jury Instructions. It is not clear whether those instructions were given to the jury or whether they were the ones that should have been given to the jury according to appellant. In any event, those four loose pages are not file-stamped by the trial court and therefore will not be considered under appellant's second assignment of error.